**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CARSON BLOCK, | : | |
| | : | |
| *Plaintiff,* | : | CIVIL ACTION |
| | : | |
| v. | : | NO. |
| | : | |
| KEVIN R. BARNES, | : | |
| | : | |
| *Defendant.* | : | |

## **COMPLAINT**

Plaintiff Carson Block, by and through his attorneys, hereby brings this action against Defendant Kevin R. Barnes and respectfully avers the following facts:

### **INTRODUCTION**

1. This is an action for damages arising out of Mr. Barnes' defamatory statements of and concerning Mr. Block, which were knowingly false and injured Mr. Block.

2. Mr. Block is the founder and sole owner of two related entities: Muddy Waters, LLC, which owns muddywatersresearch.com, a widely respected information service that disseminates investigative reports about publicly traded companies to the investment public; and Muddy Waters Capital LLC, an independent financial news organization that is also an SEC-registered investment adviser (collectively "Muddy Waters").

3. Muddy Waters is an award-winning journalistic enterprise that has produced numerous "whistleblowing" reports about publicly traded companies, exposing fraud, financial inaccuracies, and corporate malfeasance and wrongdoing.

Muddy Waters participates in "activist short selling" – when Muddy Waters publishes its financial research about a company, it always discloses its short position in the company's stock. If Muddy Waters publishes information that the market deems important and credible, the financial markets should reflect the new information, which will result in a profit to Muddy Waters' investment management clients. Independent journalists with an activist business model such as Muddy Waters have carved out a niche in financial journalism and financial markets, providing vital information to investors. The model also provides an alternative revenue source (e.g., not subscriptions or advertising) for Muddy Waters' journalistic efforts.

4.      Mr. Block founded Muddy Waters in 2010 while living in China. He had practiced law there for the international law firm Jones Day, co-authored "Doing Business in China for Dummies" (Wiley 2007), and is proficient in Mandarin Chinese.

5.      In 2010 and 2011, Muddy Waters reported on seven China-based companies listed in the U.S. and Canada, leading Bloomberg BusinessWeek to name Mr. Block "[o]ne of the 50 Most Influential in Global Finance" in 2011. Muddy Waters' exposés of China-based companies during this time led to high-level discussions between the U.S. and Chinese governments over auditor inspection rights, and ultimately were influential in the 2020 enactment of the Holding Foreign Companies Accountable Act.

6.      This case stems from Muddy Waters' accurate 2011 report of corporate wrongdoing by Focus Media, a digital media and advertising company in China. At all relevant times, Mr. Block was (and to this day is) the sole owner of Muddy Waters. At the time of the Focus Media report, it had no full-time employees other than Mr. Block. He served as its Chief Executive Officer and Director of Research, and he hired,

supervised, and led the Muddy Waters team that provided vital information for a federal investigation of Focus Media.

7.      Specifically, Muddy Waters discovered that Focus Media had made material misrepresentations regarding its business and was misleading its investors by, among other things, significantly overstating the number of screens in its LCD advertising network.

8.      In November 2011, Muddy Waters published the first of six investigatory reports regarding Focus Media. Mr. Block was the sole named author on the cover of the report. Muddy Waters published the five other reports on Focus Media on November 29, 2011, December 9, 2011, January 6, 2012, February 9, 2012, and January 24, 2013. The subsequent reports, which used a different document template, did not specify any author on their covers.

9.      The SEC soon brought an enforcement action against Focus Media and its chairman and CEO, Jason Jiang. They eventually settled, and the SEC fined them $55.6 million – for wrongdoing that had been detailed in Muddy Waters' reports.

10.     Under its Whistleblower Program, the SEC provides awards to qualifying whistleblowers who provide information that significantly contributes to certain successful enforcement actions and penalties.

11.     On March 11, 2022, the SEC entered a final order awarding Mr. Block $14 million in connection with the Focus Media enforcement action.

12.     Mr. Barnes opposed that decision. He too had sought an award from the SEC in connection with Focus Media, but he had been rejected. He appealed the SEC's decision to the United States Court of Appeals for the Third Circuit in April 2022 (which denied the petition in March 2023).

13.     Then Mr. Barnes went after Mr. Block. In late July, he filed a baseless
Summons with Notice against Mr. Block and Muddy Waters in New York state court.
Upon filing, Mr. Barnes immediately went to the press, making false and defamatory
statements against Mr. Block. Mr. Barnes exaggerated his role in Muddy Waters'
investigation and exposure of Focus Media's wrongdoing, and he asserted that Mr. Block
had received and kept in full the proceeds of the SEC award, despite supposedly having
agreed to share those proceeds with Mr. Barnes.

14.     These statements were false. As detailed below, Mr. Barnes' role in the
development of the Focus Media reports was limited; he was only one of six individuals
who worked on the investigation, and he was not proficient in Mandarin Chinese. His
contributions were so limited that he was the only one of his colleagues who was never
chosen to engage in a future Muddy Waters project.

15.     Mr. Barnes also was no partner of Mr. Block in the investigation of and
reporting on Focus Media, or ever. Mr. Block never agreed to make Mr. Barnes his
partner, and there was no agreement that Mr. Barnes would share in the proceeds of any
future SEC or other award.

16.     Indeed, Mr. Barnes turned out to be rank unethical: among other things,
unbeknownst to Mr. Block and Muddy Waters at the time, Mr. Barnes failed to abide by
his confidentiality obligations to Muddy Waters; he earned at Muddy Waters the
nickname "Ripley" after the character in "The Talented Mr. Ripley"; and he has since
been implicated in multiple patent trolling schemes.

17.     Finally, Mr. Barnes knew full well that by July 2022 Mr. Block had not
received any money from the SEC – it was Mr. Barnes, after all, who appealed the

award. As his attorney threatened in a letter to Mr. Block, the appeal would prevent payment of the award until the appeals process had terminated.

18.     Mr. Barnes' false allegations of the supposed business partnership and Mr. Block's supposed refusal to turn over a portion of the $14 million that he allegedly had in hand are highly damaging to Mr. Block's personal and business reputation. Among other things, they falsely tell the public that Mr. Block stiffed a business partner by allegedly reneging on some obligations to pay his partner a portion of what became a substantial whistleblower award. Those false statements also tell the world that Mr. Block had the bad judgment to form a business partnership with someone who later engaged in a series of questionable business activities.

19.     Mr. Block therefore brings this suit for damages and an injunction to stop Mr. Barnes' further dissemination of these lies.

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs; and is between Mr. Block, who is a citizen of the State of Texas, and Mr. Barnes, who is, on information and belief, a citizen of the Commonwealth of Pennsylvania.

21.     Venue lies in this Court pursuant to 28 U.S.C. § 1391(b)(1) because, on information and belief, Mr. Barnes resides in the Eastern District of Pennsylvania.

## GENERAL ALLEGATIONS

### THE PARTIES

22.     Mr. Block is an individual domiciled in Austin, Texas, where he resides.
His principal place of business is also in Austin, Texas, where he is the sole owner of
Muddy Waters, LLC and Muddy Waters Capital LLC.

23.     On information and belief, Mr. Barnes resides in Malvern, PA, and
therefore is domiciled in the Eastern District of Pennsylvania.

### BACKGROUND ON MUDDY WATERS

24.     Muddy Waters is an independent financial news organization that
provides information to the investing public regarding publicly traded companies,
especially companies that have been engaged in wrongdoing or that have serious
inaccuracies in their financial statements and the information they provide to the
investing public.

25.     In 2012, Muddy Waters received the Financial Times' "Boldness in
Business Award," in recognition of its business model of improving market transparency
and accountability while expressing often unpopular points of view.

26.     Muddy Waters publishes its investigative research reports on the Muddy
Waters Research website, www.muddywatersresearch.com, free of charge. Its reports
address topics including business fraud, accounting fraud, misleading financials and
disclosures, and other fundamental problems that the market does not yet perceive in its
valuation of companies.

27.     At a time when traditional media outlets are shying away from resource-
intensive and often litigious investigative reporting on public companies, Muddy
Waters' reports serve an important function in the financial markets because they foster

transparency and accountability, thereby deterring fraud and misleading statements by publicly traded companies.

28.     Muddy Waters' reports have preceded the de-listing from national stock exchanges of eleven publicly traded corporations: Rino International Corp.; China Media Express Holdings, Inc.; Duoyuan Global Water Inc.; NQ Mobile Inc.; China Internet Nationwide Financial Services, Inc.; Sino-Forest Corp.; Superb Summit International Group Ltd.; Noble Group Ltd.; China Huishan Dairy Holding Company Limited; NMC Health plc; and China Zhongwang Holdings.

29.     Additionally, in the last two years alone, six public companies that Muddy Waters reported on (Danimer Scientific, Inc.; EHealth, Inc.; Gaotu Techedu Inc.; Nano-X Imaging Ltd.; NMC Health plc; and XL Fleet Corp.) have subsequently reported that they are under government investigation, including by regulators such as the SEC, the U.S. Department of Justice, and the U.K. Financial Conduct Authority.

30.     In addition to these public investigations, in early 2021, Muddy Waters published findings that raised concerns of money laundering by Solutions 30, a publicly traded corporation in France. Solutions 30's auditor, EY Luxembourg, subsequently refused to issue an audit opinion on the 2020 accounts. Solutions 30's own resulting internal investigation revealed that six months of its CEO's emails were inexplicably missing from the company's server.

31.     Muddy Waters' work also has assisted investors and regulators in recovering hundreds of millions of dollars in fines and restitution from companies and officers. For example, as a result of Muddy Waters' 2015 publication of a report on China Zhongwang Holdings Ltd., the U.S. Department of Justice brought a criminal action that led to a $1.8 billion award for an import duty evasion scheme.

32.     Muddy Waters' independent investigations require it to retain accountants, valuation experts, industry experts, professional investigators, freelance journalists, and other professionals, in addition to the financial researchers and analysts on Muddy Waters' team. Thus, the company incurs substantial costs and expenses for its investigations and reports. Mr. Block supervises and participates in the research.

33.     Muddy Waters' activist short selling provides financial support for its journalistic endeavors. When Muddy Waters makes a report about a company public, it announces a short position in that company. If Muddy Waters is perceived as correct in its allegations of misfeasance and malfeasance, the company's stock price usually declines as the market absorbs the information, and Muddy Waters profits for itself and its fund's investors through the short selling.

34.     Mr. Block, as the owner of Muddy Waters, enjoyed an excellent reputation prior to the events alleged herein. Even though activist short selling is controversial, Mr. Block's reports have been the gold standard: accurate information about financial fraud, misfeasance, and malfeasance, relied on by investors, journalists, and government regulators.

**MR. BLOCK MEETS MR. BARNES AND ENGAGES HIM AS AN INDEPENDENT CONTRACTOR FOR MUDDY WATERS**

35.     In early 2011, Mr. Barnes introduced himself to Mr. Block, as Mr. Barnes was attempting to enter short activism. Mr. Barnes gave as a reference a family friend who was a law professor at Mr. Block's law school alma mater. Mr. Block thought Mr. Barnes had relevant experience to work for Muddy Waters because Mr. Barnes had worked in investment banking and had attempted to form his own activist short selling firm, Absaroka Capital Management.

36.     Mr. Block and Mr. Barnes met informally. Mr. Block told Mr. Barnes that he would ask Mr. Barnes to assist on a project if he thought Mr. Barnes could be helpful.

37.     Later in 2011, Mr. Block approached Mr. Barnes to consult as an independent contractor on Muddy Waters' investigation of Sino-Forest Corp. (although Mr. Barnes was not aware of the company's identity at the time).

38.     Under this arrangement, Mr. Barnes was to be an independent consultant pursuant to a consulting agreement that included a confidentiality provision. Confidentiality was an important issue because Mr. Barnes had spoken to Mr. Block in detail about his "network" and supposedly extensive contacts in the finance industry. Mr. Block therefore explained to Mr. Barnes the importance of maintaining confidentiality about all the work that he would be doing for Muddy Waters and about Muddy Waters' work generally. Mr. Barnes agreed to maintain that confidentiality. (He would later, in relation to a different Muddy Waters project, state in an e-mail: "I pledge my complete confidentiality to the project.")

39.     Mr. Barnes' compensation was to have three components: he could trade on his own account, receive reimbursement of appropriate expenses, and be eligible for a bonus. He was not an employee paid a salary or hourly wage; and he had no interest in Muddy Waters or the proceeds from the project.

40.     Mr. Barnes, however, made excessive financial demands as he insisted on some form of guaranteed compensation.

41.     Mr. Block chose not to have Mr. Barnes work on the Sino-Forest investigation because his compensation demands were unrealistic.

42.     Muddy Waters proceeded with its investigation and reporting on Sino-Forest.

43. As a result of Muddy Waters' investigation, Sino-Forest was ultimately delisted and certain former directors and executives were charged with civil fraud by the Ontario Securities Commission.

## MUDDY WATERS' INVESTIGATION OF FOCUS MEDIA AND MR. BLOCK'S FILING FOR AN SEC WHISTLEBLOWER AWARD

44. After the significant success of Muddy Waters' Sino-Forest reporting, Mr. Barnes contacted Mr. Block. Mr. Barnes acknowledged that his obstinacy over guaranteed compensation was the biggest mistake of his career, and he asked for a second chance.

45. Later in 2011, Muddy Waters identified and began to investigate Focus Media.

46. Mr. Barnes had no involvement in identifying Focus Media for investigation.

47. Mr. Block agreed to let Mr. Barnes serve on Muddy Waters' team.

48. The terms of Mr. Barnes' independent contractor engagement on the Focus Media project were similar to what Mr. Block had previously proposed for the Sino-Forest investigation: Mr. Barnes could trade on his own account, would receive reimbursement of appropriate expenses, and could be eligible for a discretionary bonus. Mr. Barnes was not an employee who would be paid a salary or hourly wage, he had no bonus formula or guarantee, and he had no interest in Muddy Waters or the proceeds from the project. Finally, Mr. Barnes continued to have the obligation to maintain the confidentiality of his work and that of Muddy Waters.

49. All aspects of the investigation of Focus Media were directed by Mr. Block. He was the Director of Research and participated extensively in the investigation of

Focus Media. Mr. Block was also the author of all six of Muddy Waters' reports on Focus
Media, published from 2011 through 2013.

50.   To be clear:

(a)   Mr. Block neither offered nor agreed to make Mr. Barnes a partner
in Muddy Waters or the Focus Media project.

(b)   Mr. Block did not offer to share with Mr. Barnes the proceeds of any
later award that might be recovered as a result of the investigation
of Focus Media.

(c)   Mr. Barnes served only as an independent contractor who was
reimbursed for some of his expenses, free to trade on his own
account on the Focus Media investigation, and could have been
eligible for a discretionary bonus.

51.   Mr. Barnes played a relatively minor role in the investigation of Focus
Media. He was only one of six members of the Muddy Waters team researching Focus
Media onsite full-time, in addition to two team members who were onsite part-time. He
was also not proficient in Chinese, and so he could not (and did not) perform many of
the tasks required for the investigation.

52.   On November 21, 2011, Muddy Waters published its first investigative
report on Focus Media. Mr. Block was identified as the Director of Research and sole
author of that report. Mr. Barnes' primary contribution was assisting with an
approximately 3-page-long section of the 80-page report.

53.   The Focus Media investigation was highly successful. Muddy Waters
discovered that Focus Media had made material misrepresentations regarding the scope
of its business by significantly (by a factor of approximately 50 percent) overstating the

number of LCD screens in its network. The company was thus worth far less than what its financial statements and the statements of company executives stated or implied.

54.     By the time Muddy Waters published its next series of investigative reports in April 2012, Mr. Block and Muddy Waters had chosen no longer to engage Mr. Barnes. Thereafter, Mr. Barnes became involved in a series of questionable business activities. For example, he defamed a public company (Sky People Fruit Juice) when he was principal of an activist short selling firm (Absaroka Capital Management). He then engaged in a multi-year pattern of patent trolling and apparently false statements on behalf of different entities against multiple pharmaceutical, health, and technology companies (e.g., Allergan, Power Integrations, and Pernix Therapeutics).

55.     In 2015, Focus Media became the subject of an SEC enforcement action.

56.     On September 15, 2015, Focus Media and its CEO settled the action. They paid a large fine for conduct Muddy Waters highlighted in its report – specifically in a section entitled "All (Directors Say) Yes to Enriching Insiders," which played off the name of one of Focus Media's subsidiaries, "Allyes."

57.     The SEC operates a Whistleblower Program for individuals (but not companies) who provide "high quality original information that leads to a Commission enforcement action." Those individuals are eligible for a cash award.

58.     Mr. Block was eligible for such an award because the information he supplied to the SEC led to the enforcement action against Focus Media. Among other things, Mr. Block financed the research, assembled the team, directed the research process, wrote substantially all of Muddy Waters' initial and five subsequent Focus Media reports, was persistent in contacting the SEC and bringing to its attention Muddy

Waters' findings, dialogued with the SEC about Focus Media on multiple occasions, and

provided thousands of pages of documents to the SEC.

59.     As the SEC stated in its press release on the award:

The Securities and Exchange Commission today announced an award of
about $14 million to a whistleblower who published an online report
exposing an ongoing fraud. The whistleblower, who days later shared the
same information with the SEC and was persistent in reaching out to the
staff, prompted the opening of an investigation which resulted in a
successful enforcement action and the return of millions of dollars to
harmed investors.

Press Release, Sec. & Exch. Comm'n, *SEC Awards Approximately $14 Million to*

*Whistleblower* (Mar. 11, 2022), https://www.sec.gov/news/press-release/2022-40.

60.     Mr. Block memorialized his reporting in an SEC tip form, and he engaged

counsel to claim a whistleblower award.

61.     By Order dated March 11, 2022, the SEC awarded Mr. Block a $14 million

whistleblower award. A true and correct copy of the Final Order is attached as Exhibit A.

62.     Around the time Mr. Block was preparing his SEC whistleblower award

application, Mr. Barnes (who knew nothing of the application) made an offer to Mr.

Block to "quarterback" the submission of an award application. Mr. Barnes did not

mention – or in any way indicate – to Mr. Block his claim to have been Mr. Block's

partner, but rather framed his offer as simply an offer to assist in the application.

63.     In fact, Mr. Barnes stated that he thought the opportunity to apply for a

whistleblower award belonged to Muddy Waters, writing "MW would have 90 calendar

days to file SEC Form WB-APP to the Office of the Whistleblower to be eligible for a

payment."

64.     Mr. Block declined Mr. Barnes' offer to "quarterback" the process, informing Mr. Barnes that Mr. Block had already retained counsel to assist with the application.

65.     The 90-day period for filing a whistleblower claim ran from approximately October 30, 2015 to January 28, 2016, and both Mr. Block and (unbeknownst to him) Mr. Barnes timely filed applications for an SEC whistleblower award during that period. However, as late as December 30, 2017, Mr. Barnes was e-mailing Mr. Block, updating him as to the finalization of the SEC sanction against Focus Media and the possibility of a whistleblower award. In other words, Mr. Barnes was encouraging Mr. Block to pursue his whistleblower claim, while having secretly filed with the SEC his own competing claim for the same award – a claim that, if successful, would have reduced or even barred any award to Mr. Block.

66.     Mr. Barnes did not himself provide the SEC any information (he was simply arguing that he was responsible for the information Mr. Block provided), did not fill out or submit the tip form, and did not have any high-quality original information to contribute. The information that led to the SEC enforcement operation was contributed by Mr. Block after being generated by Mr. Block and his company, Muddy Waters.

67.     Further, Mr. Block did not, and has never had, any obligation to share the proceeds of the award with Mr. Barnes. As noted:

      (a)    Mr. Block never entered into any agreement to share the proceeds of any such award with Mr. Barnes.

      (b)    Mr. Block had no reason to make any such agreement with Mr. Barnes because Mr. Barnes was otherwise compensated by Muddy Waters as an independent contractor.

(c)     Mr. Barnes' work was, in fact, fairly minor, as he was part of a team
retained by Muddy Waters, and Mr. Barnes lacked the Chinese
language skills necessary to read the thousands of pages of Chinese
documents that formed the backbone of Muddy Waters' Focus
Media research.

(d)     None of the others who worked on the Focus Media investigation
had been granted or promised a portion of the whistleblower award,
despite having made more substantial contributions to Muddy
Waters' reports than Mr. Barnes did. In fact, no employee or
consultant of Muddy Waters has ever been guaranteed any
percentage of any whistleblower award, despite many of them
having made far more substantial contributions to Muddy Waters'
reports than did Mr. Barnes.

68.     In the same March 11, 2022 Order granting Mr. Block the $14 million
award, the SEC denied Mr. Barnes' application.

69.     Rather than accept the final order of the SEC, Mr. Barnes appealed it to
the United States Court of Appeals for the Third Circuit, requesting (among other
things) that that the Court set aside the SEC's denial to him of an award.

70.     In a not-precedential opinion dated March 23, 2023, a unanimous panel of
the Court denied the Petition. *See Doe (Claimant #2) v. SEC*, 2023 WL 3562977 (3d Cir.
Mar. 23, 2023). In so doing, the Court made clear that Mr. Barnes was not entitled to
receive from the SEC any of the whistleblower proceeds.

## MR. BARNES' DEFAMATION OF
## MR. BLOCK

71.     Mr. Barnes' appeal of the SEC's decision denying him a whistleblower
award had the effect of obstructing the SEC's $14 million payment to Mr. Block.

72.     Both before and during the prosecution of the appeal, Mr. Barnes and his
counsel repeatedly contacted Mr. Block and Muddy Waters to demand money from
them.

73.     Because Mr. Block did not accede to these extortion attempts, Mr. Barnes
embarked on a strategy of baseless litigation and defamation.

74.     On July 25, 2022, Mr. Barnes filed a Summons with Notice against Mr.
Block and Muddy Waters in New York state court. It alleges in conclusory fashion that
they are liable to Mr. Barnes for a "breach of partnership, unjust enrichment, and
constructive trust." The Summons with Notice is founded on the false premise that Mr.
Block and Mr. Barnes had entered into some "agreement" or "partnership" whereby Mr.
Block agreed to share any proceeds of legal or regulatory actions arising from the Focus
Media investigation. A true and correct copy of the Summons is attached as Exhibit B.

75.     A Summons with Notice is a New York state procedure that is primarily
used to toll a statute of limitations as of the date of filing. Service of the Summons
imposes no obligation on a defendant to respond substantively – and actually the
defendants cannot respond because the Summons does not describe the case in a
substantive way. Thus, the only obligation on a defendant is to file a notice of
appearance. Such a served defendant can, if he wishes, demand a complaint – which
then places a further obligation on the plaintiff – or he can wait for plaintiff to serve a
complaint within 20 days of filing of the notice of appearance. Either way, the plaintiff

has to file a complaint before a deadline for the defendant to respond substantively is triggered.

76.     Mr. Barnes' Summons with Notice was not served on Muddy Waters and Mr. Block until July 29 and August 13, 2022, respectively.

77.     With the not-yet-served Summons with Notice as a legal fig leaf and bait for the press, Mr. Barnes launched in late July 2022 his campaign to defame Mr. Block.

78.     Specifically, on or about July 27, 2022, Mengqi Sun, a reporter for the *Wall Street Journal*, contacted Mr. Block for comment on a story the paper was about to run sourced to Mr. Barnes, in which Mr. Barnes was claiming that Mr. Block had received the SEC payment and then breached a partnership agreement with Mr. Barnes.

79.     On July 28, 2022, the *Journal* ran a story bearing the headline "Short Seller Carson Block Sued Over $14 Million Whistleblower Award," which stated:

> Kevin Barnes said he worked with Mr. Block on a report on Focus Media Holding Ltd. that formed the basis of a SEC action, and that the two had agreed to share proceeds from legal or regulatory actions stemming from their research on the China-based advertising company.
>
> . . .
>
> Mr. Barnes said in an interview with the Journal that the claimant who received the award was Mr. Block, who has been represented by whistleblower attorney Jordan Thomas in the award process.

A true and correct copy of the article is attached as Exhibit C.

80.     These statements were and are false: Mr. Barnes was never Mr. Block's partner, they never agreed to share any proceeds, and Mr. Block had not "received" the award from the SEC – Mr. Barnes' appeal had blocked the SEC from paying it.

81.     The very next day (July 29, 2022), Mr. Barnes' campaign to defame Mr. Block continued. In an article entitled "Mystery of Carson Block SEC Payout Deepens

With Suit Outing Him" by an investigative reporter for *Bloomberg*, Barnes' lawyer

David Slarskey is quoted on behalf of Mr. Barnes as follows:

> "There is no explanation for why the SEC recognized Mr. Barnes as an author of the report, and noted his claim, but did not compensate him with part of the award," Slarskey wrote in a statement on his client's behalf. "Even more than that, though, Carson Block used Mr. Barnes and his work to obtain this windfall. That isn't fair either."

A true and correct copy of this article is attached as Exhibit D.

82.     These statements also were and are false: Mr. Barnes was compensated for

his (limited) contributions, he was never promised anything more, and, as the facts of

the Focus Media investigation amply show, the SEC ruling was just.

83.     These false statements are immensely harmful to Mr. Block's reputation.

They tell the financial community and any potential contracting party that Mr. Block

cannot be trusted in his business dealings.

84.     Mr. Block's and Muddy Waters' success depends upon their reputation for

trustworthiness, which has been earned from over a decade of reliable and accurate

work.

85.     As a result of Mr. Barnes' statements, Mr. Block has suffered damages in

an amount to be proven at trial, but which exceeds $75,000.

86.     Further, because these statements have caused Mr. Block irreparable harm

– both because of the nature of the injury and the possible difficulty in calculating

damages with sufficient precision – he is entitled to a permanent injunction to rectify

Mr. Barnes' prior statements and to prevent Mr. Barnes from making future defamatory

statements about Mr. Block.

## LITIGATION BETWEEN MR. BARNES, MR. BLOCK, AND MUDDY WATERS CONTINUES

87.     Because of Mr. Barnes' defamation and ongoing efforts to shake-down Mr. Block, on August 25, 2022, Mr. Block filed a defamation action against Mr. Barnes in the United States District Court, Western District of Texas, Austin Division (the "Texas Action"). A true and correct copy of the Texas Complaint is attached as Exhibit E.

88.     Mr. Block's defamation lawsuit broadly alleged Mr. Barnes' pattern of misconduct and misrepresentations in connection with the Focus Media matter. Those allegations arise from the same facts as those alluded to in the Summons with Notice that Mr. Barnes filed in New York.

89.     The defamation action was filed in Austin, Texas because that is where Mr. Block resides. Additionally, personal jurisdiction over Mr. Barnes could be accomplished in Texas because, among other things, the defamation of Mr. Block occurs where he lives.

90.     New York was not an appropriate location for the defamation action because, among other things, (a) none of Muddy Waters' investigation of Focus Media occurred in New York; (b) none of the key witnesses is located in New York (e.g., neither Mr. Block nor Mr. Barnes reside there); and (c) Muddy Waters has its offices in Texas, not New York.

91.     The Texas Action was filed before Mr. Barnes filed a Complaint against Mr. Block and Muddy Waters.

92.     Further, on August 24, 2022, Mr. Block and Muddy Waters timely filed a Notice of Removal of the Summons with Notice to the United States District Court for the Southern District of New York.

93.     Only on September 26, 2022 – a month *after* Mr. Block filed his defamation action in Texas – did Mr. Barnes file and serve a Complaint in the Southern District of New York (the "New York Action"). A true and correct copy of the New York Complaint is attached as Exhibit F.

94.     Mr. Barnes' Complaint confirmed that it relates to the same subject matter as Mr. Block's prior filed Complaint for defamation in Texas. By way of example, each concerns (a) Muddy Waters' investigation of Focus Media, including Mr. Block's and Mr. Barnes' respective roles in the investigation, and the preparation and authorship of Muddy Waters' written report; (b) Mr. Block's and Mr. Barnes' requests to the SEC for a whistleblower award and the SEC's ultimate award; and (c) the allegation by Mr. Barnes that Mr. Block supposedly entered into some partnership or agreement to share the proceeds of an SEC whistleblower award.

95.     Significantly, Mr. Barnes' subsequently filed New York Complaint mirrors in many ways the allegations of Mr. Block's earlier filed Texas Complaint.

96.     For example, Mr. Block's Complaint (accurately) (i) alleges Mr. Barnes' minimal role in the preparation and authorship of the report, (ii) calls out Mr. Barnes' wrongdoing in trying to collect a whistleblower award from the SEC, and (iii) denies that any such agreement had been made with Mr. Barnes.

97.     Mr. Barnes' later filed New York Complaint (erroneously) alleges that (i) he played an important role in preparing and authoring the report, (ii) the SEC should have awarded him (and not Mr. Block) the whistleblower award, and (iii) there was a meeting at which Mr. Block agreed to partner with Mr. Barnes and share a whistleblower award.

98.     The parallels continue as both Mr. Barnes on the one hand and Mr. Block and Muddy Waters on the other each filed substantially similar motions to dismiss to the Texas and New York Complaints.

99.     For example, Mr. Barnes' motion argued, among other things, that (i) there is no venue or personal jurisdiction over Mr. Barnes in the Western District of Texas, and (ii) the allegations of the Texas Complaint fail to state a claim upon which relief can be granted. The motion requested that the Texas case be dismissed or in the alternative transferred to the Southern District of New York.

100.    Mr. Block's and Muddy Waters' motion likewise argues that (i) the Southern District of New York lacks personal jurisdiction over Mr. Block and Muddy Waters; (ii) venue does not lie in that district; (iii) the case should be dismissed on *forum non conveniens* grounds because litigating the case in New York would be inconvenient to both parties; and (iv) a host of substantive bases for dismissing the causes of action for failure to state a claim upon which relief can be granted.

101.    On March 22, 2023, Texas Magistrate Judge Dustin M. Howell issued a Report and Recommendation recommending that Mr. Barnes' Motion to Dismiss be granted on personal jurisdiction and venue grounds, without reaching any of Mr. Barnes' merits-based arguments, and that the cause of action be dismissed without prejudice to its being filed in a proper district. Mr. Block objected to the Report and Recommendation, while Mr. Barnes responded by urging the District Judge to adopt the Magistrate's recommendation. As of the date of this filing, the District Judge has not issued a ruling as to the Magistrate's recommendation.

102.    Upon the filing of this Complaint, Mr. Block will advise the Texas District Court of this Complaint and further advise the Court that he will not appeal any adverse ruling as to the Magistrate's recommendation of dismissal without prejudice.

103.    Mr. Block's and Muddy Waters' motion to dismiss in the New York Action is pending and has not yet been ruled upon by the New York District Court. As a result, also upon the filing of this Complaint, Mr. Block's New York counsel will notify the Court of this filing and suggest that, should the New York Action not be dismissed or otherwise disposed of based on the pending motion, Mr. Block would consent to transfer of that Action to the Eastern District of Pennsylvania for any further proceedings.

104.    The New York and Texas Actions should proceed in the Eastern District of Pennsylvania for multiple reasons, including the following:

(a)    This District has personal jurisdiction over both parties, Mr. Barnes and Mr. Block;

(b)    Venue lies in this District over both actions;

(c)    Proceeding in this District is the most convenient forum because (on information and belief) Mr. Barnes resides here and, given that the Texas Magistrate Judge has recommended dismissal of the Texas Action, there is no other more convenient forum, including the Southern District of New York; and

(d)    The allegations presented in Mr. Block's Texas Complaint and Mr. Barnes' New York Complaint substantially overlap, as do the parties' defenses.

## CAUSE OF ACTION

## (Defamation Against Defendant Kevin R. Barnes)

105.    Mr. Block re-alleges and incorporates herein the preceding allegations of this Complaint.

106.    Mr. Barnes published statements to the *Wall Street Journal*, and, on information and belief, authorized his lawyer to publish statements to *Bloomberg* claiming that Mr. Block repudiated and breached an agreement to share with Mr. Barnes the proceeds of the whistleblower award that the SEC awarded to Mr. Block, with the express intention that the statements would be published in the newspaper and online, and disseminated throughout the financial community and the world, and as a result would severely damage Mr. Block.

107.    The defamatory statements were false and accuse Mr. Block of serious business misconduct, and thus are defamatory per se. Readers of the *Wall Street Journal* and *Bloomberg* would understand them as statements that Mr. Block intentionally entered into an agreement with Mr. Barnes, and then deliberately refused to honor that agreement, in an effort to essentially steal millions of dollars from Mr. Barnes.

108.    The defamatory statements were of and concerning Mr. Block.

109.    The defamatory statements were made with actual malice, because Mr. Barnes knew full well that he and Mr. Block never had a partnership agreement, or any other agreement, to share any of the proceeds of the SEC or any other award.

110.    The defamatory statements caused Mr. Block damages in an amount to be proven at trial and in excess of $75,000.

111.    Mr. Barnes, when he made the defamatory statements, acted with gross and reckless indifference for Mr. Block's rights, and the character of his conduct was outrageous.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

a.      For compensatory damages according to proof;

b.      For punitive damages according to proof;

c.      For a permanent injunction enjoining further dissemination by Mr. Barnes of the defamatory statements at issue herein, or any similar such statements;

d.      For costs of suit; and

e.      For any such other relief as may be just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues triable under Rule 38 of the Federal Rules of Civil Procedure.

HANGLEY ARONCHICK SEGAL
PUDLIN & SCHILLER

Dated:  June 28, 2023          BY:   */s/ Mark A. Aronchick*
                                     Mark A. Aronchick (Atty. I.D. No. 20261)
                                     maronchick@hangley.com
                                     John S. Summers (Atty. I.D. No. 41854)
                                     jsummers@hangley.com
                                     Michael J. Masciandaro (Atty. I.D. No. 329321)
                                     mmasciandaro@hangley.com
                               One Logan Square, 27th Floor
                               Philadelphia, PA  19103
                               (215) 568-6200


                               Dilan A. Esper (pro hac vice forthcoming)
                               Emmanuel B. Fua (pro hac vice forthcoming)
                               HARDER STONEROCK LLP
                               8383 Wilshire Blvd., Suite 526
                               Beverly Hills, CA 90211
                               (424) 203-1600
                               *Attorneys for Plaintiff*