# Exhibit E

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

CARSON BLOCK, an individual,

     Plaintiff

vs.                               Civil Action No. 1:22-cv-869

KEVIN R. BARNES, an individual,     **Complaint and Jury Demand**

     Defendant.

**COMPLAINT FOR DAMAGES AND RELATED RELIEF**

Plaintiff alleges:

**Introduction**

1.     This is an action for damages arising out of the Defendant Kevin Barnes'

defamatory statements of and concerning Plaintiff Carson Block, which were knowingly false

and injured Mr. Block.

2.     Mr. Block is the founder and sole owner of both Muddy Waters, LLC, which

owns *muddywatersresearch.com*, a widely respected information service that disseminates

investigative reports about publicly traded companies to the investment public, and Muddy

Waters Capital LLC, an independent financial news organization, which is also an SEC-

registered investment adviser (collectively "Muddy Waters").

3.     Muddy Waters is an award-winning journalistic enterprise that has produced

numerous "whistleblowing" reports about publicly traded companies, exposing corporate

malfeasance and wrongdoing, financial inaccuracies and fraud.  Muddy Waters participates in

"activist short selling"- when Muddy Waters publishes its financial research about a company, it

always discloses its short position in the company's stock.  If Muddy Waters publishes

information that the market deems is important and credible, the financial markets should reflect

1

the new information, which will result in a profit to the investment fund. Independent journalists with an activist business model such as Muddy Waters have carved out a niche in the financial journalism and financial markets, providing vital information to investors, identifying corporate wrongdoing, and providing a unique investment vehicle which in turn funds the company's journalistic efforts.

4.      Mr. Block founded Muddy Waters in 2010 while he was living in China. Mr. Block had practiced law in China for a large U.S. law firm, co-authored "Doing Business in China for Dummies" (Wiley 2007), and is proficient in Mandarin Chinese. In 2010 and 2011, Muddy Waters reported on seven China-based companies listed in the U.S. and Canada. These exposures led Bloomberg BusinessWeek to name Mr. Block "One of the 50 Most Influential in Global Finance" in 2011. Muddy Waters' exposés of China-based companies during this time led to high level discussions between the U.S. and Chinese government over auditor inspection rights, and ultimately were influential in the 2020 enactment of the Holding Foreign Companies Accountable Act.

5.      Carson Block and Muddy Waters have also won awards and have assisted the U.S. and other foreign governments with their whistleblowing.

6.      This case arises out of a report of corporate wrongdoing, identified and exposed by Muddy Waters in 2011, that was both factually accurate and provided vital information for a federal investigation of bad corporate actors.

7.      Mr. Block hires, supervises, participates, and, with Muddy Waters' team, produces the investigatory reports that are at the heart of Muddy Waters' business.

8.      In 2011, Muddy Waters identified a company in China that appeared to be engaged in serious improprieties. Focus Media was a digital media and advertising firm, and

Muddy Waters had discovered that Focus Media had significantly overstated the number of screens in its LCD advertising market, among numerous other issues, and was thus misleading investors. Focus Media was similar to another China-based company Muddy Waters exposed for overstating LCD advertising screens and revenues earlier in 2011, China MediaExpress Ltd. China MediaExpress was de-listed prior to Muddy Waters identifying Focus Media as a research subject.

9. In November 2011, Muddy Waters published the first of six investigatory reports regarding Focus Media that detailed instances of wrongdoing. Muddy Waters published five other reports on Focus Media on November 29, 2011, December 9, 2011, January 6, 2012, February 9, 2012 and January 24, 2013.

10. After identifying Focus Media, Muddy Waters employed Mr. Barnes as one of the researchers who assisted Mr. Block on the Focus Media project. Mr. Barnes played a role, but it was a fairly minor one. Mr. Block, as Muddy Waters' Director of Research, is clearly named on the cover of the initial Focus Media report as the author of the report. There were no other authors listed, nor were there other authors behind the scenes. Following publication of the report, Mr. Block, and only Mr. Block, spoke with numerous media outlets about the report on Focus Media.

11. In contrast, Mr. Barnes was one of a team of five researchers working under the direction of Mr. Block. Including Mr. Block, four of the six individuals were proficient in Mandarin Chinese; and, Mr. Barnes was one of only two who were not, which limited his ability to contribute. Significantly, Mr. Barnes was the one of the five Focus Media researchers whom Muddy Waters chose never to engage again on future projects.

12. Mr. Barnes had agreed in writing to a non-disclosure agreement, which is crucial because of the sensitivity of Muddy Waters' work. However, Mr. Barnes violated the non-disclosure agreement and tipped off a hedge fund about Muddy Waters' plan to publish on Focus Media. Mr. Block and Muddy Waters decided never to work with Mr. Barnes again. Mr. Barnes went on to work full-time for the hedge fund that he tipped off.

13. Inside Muddy Waters, Mr. Barnes gained the nickname "Ripley," from *The Talented Mr. Ripley*, a film about a brazen imposter and con-artist.

14. The SEC operates a whistleblower program for individuals who provide high quality original information which leads to an enforcement action against a company. Those individuals are eligible for a cash award. Mr. Block – who financed the research, assembled the team, directed the research process, wrote substantially all of Muddy Waters' initial and five subsequent Focus Media reports, was persistent in contacting the SEC just after publication about Muddy Waters' findings, dialogued with the SEC about Focus Media on multiple occasions, and provided thousands of pages of documents to the SEC – was eligible for such an award because the information he supplied to the SEC led to a 2015 enforcement action against Focus Media. Focus Media settled the enforcement action by paying a large fine for conduct Muddy Waters highlighted in its report, specifically in a section Mr. Block wrote titled "All(Directors Say)Yes to Enriching Insiders", which played off the name of one of Focus Media's subsidiaries, "Allyes". Mr. Block applied for a whistleblower award from the SEC and eventually was awarded $14 million by the SEC. As discussed further below, due to Mr. Barnes' meritless interference in the SEC awards process, Mr. Block has not received any of this award to date. Yet Mr. Barnes has told the bald-faced lies that a) Mr. Block received the award, and b) Mr. Block has refused to pay him from the proceeds.

15.     Mr. Block has applied for these whistleblower awards in the past with respect to other investigations he directed, produced, and published through Muddy Waters.  Mr. Block has never agreed to partner with any employee or consultant on such an application or to guarantee a share a whistleblower award.  Mr. Block also never entered into any agreement with any of the people who did more work on the Focus Media matter than Mr. Barnes did to share proceeds on a whistleblower award.  The notion that Mr. Barnes, alone among the onsite Focus Media researchers in not being engaged for subsequent work by Muddy Waters, would be the only researcher to whom Mr. Block guaranteed a share of the whistleblower claim – let alone half of it – is preposterous.  Mr. Barnes compounded this egregious falsehood by knowingly and falsely stating that Mr. Block had received the award from the SEC without paying him his purported share.

16.     In 2015, long after Mr. Block had ceased any business dealing with Mr. Barnes, Mr. Barnes contacted Mr. Block in relation to the Focus Media settlement with the SEC and the possibility of submitting an application to the SEC for a whistleblower award.  In this email, Mr. Barnes offered to "quarterback" the submission of the award application.  Mr. Block declined Mr. Barnes' offer of assistance, and told Mr. Barnes that Mr. Block had already engaged an attorney to prepare the submission.  Then, unbeknownst to Mr. Block at the time, Mr. Barnes applied for a whistleblower award, claiming that **he**, Mr. Barnes, was responsible for providing the information to the SEC that led to the enforcement proceeding against Focus Media.  Mr. Barnes made this claim to the SEC notwithstanding the fact that he had been only a relatively minor member of the team that produced the Focus Media report.

17.     After Mr. Barnes' meritless competing whistleblower claim was denied while Mr. Block's claim was upheld, Mr. Barnes, through his counsel, contacted Mr. Block.  Mr. Barnes

threatened to appeal his denial and thereby hold up Mr. Block's $14 million award.  Mr. Barnes

offered Mr. Block the chance to avoid the delay by agreeing to pay a portion of the award to Mr.

Barnes.  Mr. Block refused the shakedown, and Barnes did in fact appeal.  This appeal, as Mr.

Barnes had threatened, has thus far prevented Mr. Block from receiving any of the whistleblower

award to which he is legally entitled.

18.     Mr. Barnes also has conducted a concerted media defamation campaign against

Mr. Block in a further attempt to coerce Mr. Block into paying a portion of the whistleblower

award to Mr. Barnes.  Mr. Barnes has spoken made false claims to a number of journalists –

including that Mr. Block has received the award without paying Mr. Barnes, that Mr. Block and

Mr. Barnes were supposedly partners, and that Mr. Block and Mr. Barnes had agreed to split any

whistleblower award 50-50.  Thus, Mr. Barnes claims, Mr. Block received the money, and stiffed

him on the 50% of $14 million that he supposedly owes to Mr. Barnes.

19.     These allegations are completely false:  Mr. Barnes has made good on his threat

to delay payment of the award to Mr. Block through an appeal.  Moreover, Mr. Barnes was never

Mr. Block's partner, and there was never agreement to split anything 50-50.  Mr. Barnes

received compensation from Muddy Waters as one minor participant in the Focus Media project,

and never worked for Muddy Waters again after that.  Mr. Barnes made his false "partnership"

claim and his false claim that Mr. Block has been paid by the SEC, to a reporter at the *Wall

Street Journal*, ensure widespread dissemination of his false accusations throughout the financial

community where Mr. Block does business, to cause maximum harm to Mr. Block's reputation,

career and business.

20.     Mr. Barnes' new allegation of a supposed business partnership is highly damaging

to Mr. Block, because it tells the public that Mr. Block would have been willing to enter a

business partnership with a highly unethical figure, and that Mr. Block allegedly reneged on his alleged contractual obligations to pay his "business partner".

21.     In addition to Mr. Barnes' secretly submitting false information to the SEC in an attempt to steal Mr. Block's whistleblower award, Mr. Barnes also has been implicated in patent trolling schemes.  The prominent pharmaceutical company Allergan sued Mr. Barnes, alleging that Mr. Barnes filed a baseless challenge to one of Allergan's patents, in an attempt to extort a settlement with Allergan, just as Mr. Barnes is trying to use litigation to extort a settlement from Mr. Block.  Incredibly, Mr. Barnes alleged in his filings that his company was about to bring to market a generic version of an Allergan glaucoma treatment, yet Mr. Barnes and his "company" had no facilities to manufacture such a drug, and employed no scientists at all to develop it.  Mr. Barnes simply lied to the Patent and Trademark Office in an attempt to force Allergan to pay his company a nuisance payment to go away.

22.     The Allergan lawsuit received substantial publicity and identified Mr. Barnes as a fraud.  The implication that Mr. Block would have been business partners with a publicly-known fraud is highly injurious to Mr. Block.

23.     The Allergan lawsuit was not the only time that Mr. Barnes was identified in patent trolling.  Mr. Barnes also received negative publicity after attempting to extort a $600,000 settlement from another company, Power Integrations, by threatening to bring a proceeding in the PTO challenging one of its patents.

24.     Mr. Barnes' false statements tell the world that Mr. Block had the bad judgment to form a business partnership with a notorious fraud and extortionist, and that Mr. Block even allegedly stiffed this business partner $7 million (a completely false accusation), thereby causing substantial damages to Mr. Block's personal and business reputation.  Mr. Block brings this suit

to redress his claims, compensate for these damages, and enjoin Mr. Barnes from further

dissemination of these lies.

## Jurisdiction and Venue

25.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(1), because

Mr. Block is domiciled in Austin, Texas, and Mr. Barnes is, on information and belief, domiciled

in Pennsylvania, near Philadelphia.

26.     Venue lies in this Court under 28 U.S.C. § 1391(b)(2) and, alternatively, (b)(3),

because a substantial part of the events giving rise to this claim occurred in Austin, Texas, and

alternatively, because Mr. Barnes is subject to personal jurisdiction here.

## General Allegations

27.     Mr. Block is an individual domiciled, and with his principal place of business, in

Austin, Texas, and is the sole owner of Muddy Waters, LLC and Muddy Waters Capital LLC.

28.     Mr. Barnes is an individual domiciled in Pennsylvania, near Philadelphia.

## Background on Muddy Waters

29.     Muddy Waters is an independent financial news organization that provides

information to the investing public regarding publicly traded companies, especially companies

that have been engaged in wrongdoing or who have serious inaccuracies in their financial

statements and the information they provide to the investing public.

30.     In 2012, Muddy Waters received the *Financial Times*' "Boldness in Business

Award," in recognition of its business model of improving market transparency and

accountability while expressing often unpopular points of view.

31.     Muddy Waters publishes its investigative research reports on the Muddy Waters

Research website, *www.MuddyWatersResearch.com*, free of charge.  Its reports address topics

including business fraud, accounting fraud, and fundamental problems in companies that the market does not yet perceive.

32.     Muddy Waters' reports serve an important function in the financial markets because they foster transparency and accountability, thereby deterring fraud and misleading statements by publicly traded companies.

33.     Muddy Waters' reports have preceded eight de-listings of publicly traded corporations by regulators from national stock exchanges.  These include de-listings of Rino International Corp., China Media Express Holdings, Inc., Duoyuan Global Water Inc., NQ Mobile Inc., and China Internet Nationwide Financial Services, Inc.

34.     After Muddy Waters' 2011 report on fraud at Sino-Forest Corp., a Chinese company listed on the Toronto Stock Exchange, the company filed for bankruptcy, and the Ontario Securities Commission found that the company and four senior executives had committed fraud.

35.     Muddy Waters' reports on NMC Health plc at the end of 2019 and early 2020 exposed fraud and hidden debt.  NMC Health had fraudulently understated its debt by about $4 billion, and the company filed for bankruptcy less than six months after Muddy Waters exposed its fraud.  It was de-listed from the London Stock Exchange and is now the subject of a criminal complaint.

36.     After Muddy Waters' 2014 report on Hong Kong listed Superb Summit International Group Ltd., there was a four-year trading halt, followed by de-listing.

37.     After Muddy Waters' 2016 fraud exposure report on Hong Kong-listed China Huishan Dairy Holding Company Limited, the company's stock was de-listed.

38.     In the last two years alone, six public companies that Muddy Waters reported on (Danimer Scientific, Inc., EHealth, Inc., Gaotu Techedu Inc., Nano-X Imaging Ltd., NMC Health pic, and XL Fleet Corp.) have subsequently reported that they are under government investigation, including by regulators such as the SEC, the U.S. Department of Justice and the U.K. Financial Conduct Authority.

39.     In addition to these public government investigations, in early 2021, Muddy Waters published findings that raised concerns of money laundering by Solutions 30, a publicly traded corporation in France. Solutions 30's auditor, EY Luxembourg, subsequently refused to issue an audit opinion on the 2020 accounts.  Solutions 30's own resulting internal investigation revealed that six months of its CEO's emails were inexplicably missing from the company's server.

40.     Muddy Waters' work also has assisted investors and regulators in recovering hundreds of millions of dollars in fines and restitution from companies and officers. For example, as a result of Muddy Waters' 2015 publication of a report on China Zhongwang Holdings Ltd., the U.S. Department of Justice brought a criminal action that led to a **$1.8 billion** award for an import duty evasion scheme.

41.     Muddy Waters performs independent investigations that require the company to retain accountants, valuation experts, industry experts, professional investigators, freelance journalists, and other professionals, in addition to the financial researchers and analysts on Muddy Waters' team.  Thus, the company incurs substantial costs and expenses for its investigations and reports.  Mr. Block himself participates in, and supervises, the research.

42.     Muddy Waters' business model of financial journalism, married with activist short selling, provides financial support for its journalistic endeavors.  When Muddy Waters

makes a report public about a company, Muddy Waters announces a short position in that company. If Muddy Waters is correct in its allegations of misfeasance and malfeasance (and it always has been), the stock price usually declines as the market absorbs the information, and Muddy Waters profits for itself and its fund's investors through the short selling.

43.     There are a number of activist short selling operations in the marketplace. Among those activist short sellers, Muddy Waters enjoys a one of the strongest reputations for probity, accuracy, transparency, and ethics. Some critics broadly accuse the activist short selling sector of "shorting and distorting", that is, putting out false or misleading information for the purpose of generating a decrease in stock price that generates profits for the short sellers. Muddy Waters does not, and has never, engaged in short and distort schemes. Its research reports have been accurate and responsible, and it has been lawful and ethical in its trades.

44.     Mr. Block, as the owner of Muddy Waters, similarly enjoyed a good reputation prior to the events alleged herein. Even though activist short selling is controversial, Mr. Block's reports are the gold standard: accurate information about financial fraud, misfeasance, and malfeasance, relied on by investors, journalists, and governmental regulators.

**The Focus Media Investigation**

45.     In or around 2011, Muddy Waters investigated a company called Focus Media, a digital advertising company. Muddy Waters discovered, among other things, that Focus Media had significantly (by a factor of approximately 50 percent) overstated the number of LCD screens in its network, and thus the company was worth far less than what its financial statements and the statements of company executives stated or implied.

46.     All aspects of the investigation of Focus Media were directed by Mr. Block, who participated extensively in the research and was the author of all six of Muddy Waters' reports

on Focus Media.  Those reports were published from 2011 through 2013, which was well after

Mr. Block and Muddy Waters ceased doing business with Mr. Barnes.

47.    Muddy Waters contracted with Mr. Barnes to work on the initial Focus Media

report and on a possible report on another company.  Mr. Barnes had worked for JP Morgan, and

by virtue of having attempted to form his own activist short selling firm, Absaroka Capital

Management, had some relevant experience.  However, Mr. Barnes did not speak Chinese and

therefore could not perform many of the tasks required (Focus Media and the other company

were both Chinese companies).  Nonetheless, Mr. Barnes did perform some work on the two

projects and was primarily compensated by being allowed to trade for his own account in

securities of Focus Media.  Muddy Waters paid his travel expenses, sending him a wire in

advance.

48.    At no time did Muddy Waters or Mr. Block ever enter into a partnership

agreement with Mr. Barnes or any company of his.  Rather, Mr. Barnes performed work as an

independent contractor for Muddy Waters—*part* of the team that worked on the two projects.

Mr. Block of Muddy Waters expressly informed Mr. Barnes that he would be working as a

consultant.

49.    Mr. Barnes was bound by a non-disclosure agreement with Muddy Waters.  Such

agreements are common in Muddy Waters' business, and important, because the early disclosure

of confidential information or any sort of tipping off of particular investors would be both

unethical and could cause Muddy Waters to lose money on its trading.  Therefore, Muddy

Waters adheres scrupulously to these principles: it binds those who work on its reports to non-

disclosure agreements, and releases its reports along with a disclosure of Muddy Waters'

position if it is shorting the stock.  Mr. Block discussed the importance of confidentiality in depth

with Mr. Barnes, and Mr. Barnes unconditionally assented to the non-disclosure obligation. Mr. Barnes stated in an e-mail: "I pledge my complete confidentiality to the project".

50.     From the very start of Muddy Waters' brief business relationship with Mr. Barnes, Mr. Block had concerns about Mr. Barnes' adherence to confidentiality, as he spoke in detail about his "network" and supposedly extensive contacts in the finance industry. However, Muddy Waters proceeded in contracting with him to work on Focus Media and the other project. Mr. Barnes ultimately violated his non-disclosure agreement, by disclosing confidential information about the impending Focus Media report to a hedge fund, which allowed the hedge fund to take a short position and profit off the release of Muddy Waters' report. Mr. Block eventually discovered Mr. Barnes' violation of his agreement, and decided for this and other reasons that Mr. Barnes was unreliable and dishonest. Muddy Waters decided it would not do future business with Mr. Barnes or utilize his services on any other reports. Mr. Barnes thereafter went to work full time for the hedge fund to which he provided the improper tip.

51.     After the Focus Media matter, Mr. Barnes kept in touch with Mr. Block. While Mr. Block continued to be cordial (and indeed has been cordial with Mr. Barnes right up until the events giving rise to this lawsuit), Mr. Block never again proposed or accepted any proposal to do business with Mr. Barnes.

52.     Because Muddy Waters' report disclosed serious securities law violations on the part of Focus Media, Mr. Block filled out a tip form and reported the violations to the SEC, and engaged counsel to claim a whistleblower award. Under the SEC whistleblower program, individuals (but not companies) may receive a monetary award for providing "high quality original information that leads to a Commission enforcement action". Mr. Block felt the information about Focus Media qualified under this standard.

53.     At no time did Mr. Block enter into any agreement to share the proceeds of any SEC whistleblower award with Mr. Barnes.  In fact, Mr. Block had no reason to make any such agreement with Mr. Barnes, because he was compensated by Muddy Waters as an independent contract for the work that he performed on the project, which was fairly minor and part of a larger group retained by Muddy Waters.  No employee or consultant of Muddy Waters has ever been guaranteed any percentage of any whistleblower claim, despite many of them having made far more substantial contributions to Muddy Waters reports than Mr. Barnes did.  Mr. Barnes was not in any way responsible for 50 percent of the work product on the Focus Media project, nor did he perform any services as a partner.  He was a contract worker who performed some work on the project, but lacked the Chinese language skills necessary to read the thousands of pages of Chinese documents that formed the backbone of Muddy Waters' Focus Media research – nothing more.

54.     At the time Mr. Block filed his SEC whistleblower award application, Mr. Barnes made an offer to Mr. Block to "quarterback" the submission of an award application.  Mr. Barnes did not mention to Mr. Block his claim to be Mr. Block's partner, but rather framed his offer simply as an offer to assist in the application.  In fact, Mr. Barnes indicated that he thought the opportunity to apply for a whistleblower award belonged to Muddy Waters, stating "MW would have 90 calendar days to file SEC Form WB-APP to the Office of the Whistleblower to be eligible for a payment."  Mr. Block declined Mr. Barnes' offer to "quarterback" the process, informing Mr. Barnes that Mr. Block had already retained counsel to assist with the application.  Mr. Block is fortunate that he declined Mr. Barnes' offer of assistance, as Mr. Barnes failed to realize that he needed to submit a Form TCR.  Mr. Block, however, did submit the Form TCR.

55.     The 90-day period for filing a whistleblower claim ran from approximately October 30, 2015 to January 28, 2016, and both Mr. Block and (unbeknownst to Mr. Block) Mr. Barnes timely filed applications for an SEC whistleblower award during that period.  However, as late as December 30, 2017, Mr. Barnes was e-mailing Mr. Block, updating him as to the finalization of the SEC sanction against Focus Media and the *possibility* of a whistleblower award.  In other words, Mr. Barnes was encouraging Mr. Block to pursue his whistleblower claim, while at the same time, Mr. Barnes had secretly filed a claim with the SEC for the same award—a claim that is presently delaying and obstructing Mr. Block's claim.

56.     On January 19, 2016, nine days before the expiration of the time period to seek a whistleblower award, Mr. Barnes sent an e-mail to Mr. Block, offering assistance on Mr. Block's application for the SEC whistleblower award.  However, Mr. Barnes did not mention in the e-mail that he had just filed, or was about to file, his own application.

57.     Mr. Block later found out that, at the time Mr. Barnes now claims he was Mr. Block's "partner", and after offering to assist Mr. Block in Mr. Block's application with the SEC for a whistleblower award, Mr. Barnes had secretly filed his own competing whistleblower award application to the SEC.  Yet Mr. Barnes did not himself tip off the SEC to any information (he was simply arguing that he was responsible for the information Mr. Block provided), did not fill out or submit the tip form, and did not have any high quality original information to contribute.  The information that led to the SEC enforcement operation was contributed by Mr. Block after being generated by Mr. Block and his company, Muddy Waters.

58.     Obviously, at the time Mr. Barnes was acting secretly behind Mr. Block's back, Mr. Barnes could not have believed that he had been or was Mr. Block's partner.  Further, if Mr. Barnes thought he had an agreement to share the proceeds in Mr. Block's application, he would

not have secretly filed a competing application that could have resulted in both applications being denied by the SEC and no whistleblower award being made. Instead, Mr. Barnes would have simply made a demand on Mr. Block for his "half" of the proceeds. After working for Mr. Block on the Focus Media matter, Mr. Barnes was involved in other questionable business activities. For instance, he was the principal in the Absaroka Capital Management investment fund, which engaged in activist short selling as a copycat competitor to Muddy Waters. However, Absaroka was unsuccessful, and became inactive in 2019.

59. In 2011, Absaroka was sued for defamation by Sky People Fruit Juice, after allegedly publishing false and defamatory information about the company. Absaroka eventually settled with Sky People and agreed to remove the defamatory statements from its website.

60. In 2014, Mr. Barnes founded Ferrum Ferro Capital, LLC, to attempt to extort money from Allergan through a patent trolling scheme. As discussed *supra*, Allergan sued Mr. Barnes and Ferrum Ferro for extortion and related causes of action as a result of Mr. Barnes' actions.

61. Also in 2014, Mr. Barnes founded Hyacinth Sloop Capital, LLC, another entity involved in the patent trolling and extortion scheme against Allergan.

62. Also in 2014, Mr. Barnes founded Silver Star Capital LLC, yet another patent trolling entity, but this one attempted to extort money from Power Integrations, a Silicon Valley technology firm. Silver Star claimed a competing patent with respect to computer chips even though Silver Star was not even in the business of producing computer chips, and demanded a settlement payment of $600,000 up front to withdraw its claim.

63. In 2015, Mr. Barnes was involved in the creation of Gray Square Pharmaceuticals LLC aka Graybar Pharmaceuticals, another patent trolling entity, which attempted to assert a

challenge to Pernix Therapeutics' patent on a migraine medication. Gray Square's challenge was rejected by the Patent Trial and Appeal Board.

64. Graybar Pharmaceuticals was also sued by an unrelated company called Graybar, a distributor of data networking products, for trademark infringement. Graybar, the plaintiff data networking company, argued that Mr. Barnes' company's use of the name "Graybar" was harmful because it associated the plaintiff's name with Mr. Barnes' patent trolling.

### Mr. Barnes' Extortion Scheme Against Plaintiff Carson Block

65. On or about March 11, 2022, the SEC determined that Mr. Block qualified for a whistleblower award regarding the Focus Media matter, and Mr. Barnes did not. Shortly thereafter, Mr. Barnes appealed the SEC's decision, and then started executing his extortion scheme against Mr. Block.

66. Mr. Barnes' appeal of the SEC's decision denying his whistleblower award has had the effect of obstructing the SEC's $14 million payment to Mr. Block. Yet, Mr. Barnes claims that Mr. Block did in fact receive the award while refusing to pay him his purported share. Mr. Barnes had no valid grounds to appeal, because the SEC correctly found that he did not submit any important information about Focus Media to the SEC.

67. At the same time Mr. Barnes is prosecuting his appeal, he has repeatedly attempted to contact Mr. Block and Muddy Waters to demand money from them in exchange for dropping his appeal of the whistleblower award.

68. Importantly, Mr. Barnes' appeal of the whistleblower award is *not* based on a claim that he was Mr. Block's partner, or that Mr. Barnes and Mr. Block supposedly agreed to share the award. (The proper way to pursue a claim for breach of a partnership agreement is to allow the SEC award to become final and be paid, and then seek damages from Mr. Block for

breach of contract.) Rather, Mr. Barnes is arguing to the SEC that he, rather than Mr. Block, provided important information to the SEC regarding Focus Media.

69. Mr. Barnes then went to a number of reporters, including a *Wall Street Journal* reporter to try to damage Mr. Block, who was located in Austin, Texas, by falsely saying that Mr. Block allegedly received payment of the $14 million whistleblower award, had previously agreed to be Mr. Barnes' 50/50 partner in applying for the award, and then allegedly reneged on their agreement to pay Mr. Barnes his share. At the time Mr. Barnes made this statement, he intended that these publications, including the *Wall Street Journal*, disseminate his false statements about Mr. Block to the financial and investing community and to the world.

### The Publication of Mr. Barnes' Defamatory Statements

70. On or about July 27, 2022, Mengqi Sun, a reporter for the *Wall Street Journal*, contacted Mr. Block for comment on a story the paper was about to run sourced to Mr. Barnes, in which Mr. Barnes was claiming that Mr. Block had received the payment and then breached a partnership agreement with Mr. Barnes.

71. The next day, the *Journal* ran a story bearing the headline *Short Seller Carson Block Sued Over $14 Million Whistleblower Award*, which stated: "Kevin Barnes said he worked with Mr. Block on a report on Focus Media Holding Ltd. that formed the basis of a SEC action, and that the two had agreed to share proceeds from legal or regulatory actions stemming from their research on the China-based advertising company." This statement is false: Mr. Barnes was never Mr. Block's partner, and they never agreed to share proceeds.

72. At the time the *Journal* ran the story, Mr. Barnes had not filed any Complaint against Mr. Block alleging breach of a partnership agreement or seeking to enforce any alleged agreement to share the proceeds of the Focus Media whistleblower award.

73.     Mr. Barnes' false statements are immensely harmful to Mr. Block's reputation. They tell the financial community and any potential contracting party that Mr. Block cannot be trusted in his business dealings.

74.     Muddy Waters' reports are often produced by teams including contractors, and Muddy Waters often requires confidentiality agreements with its sources.  The success of these reports are dependent on Muddy Waters' and Carson Block's reputations for trustworthiness, which have been earned from over a decade of reliable and accurate work.  As a result of Mr. Barnes' statements, Mr. Block has suffered damages in an amount to be proven at trial but which exceeds $75,000.

75.     Mr. Barnes' statements also have caused Mr. Block irreparable harm, thereby justifying a permanent injunction against Mr. Barnes' repetition of the defamatory statements.

## FIRST CAUSE OF ACTION

### (Defamation Against Defendant Kevin R. Barnes)

76.     Mr. Block re-alleges the allegations in Paragraphs 1 through 75 herein and incorporates them by this reference.

77.     Mr. Barnes published statements to the *Wall Street Journal* claiming that Mr. Block repudiated and breached an agreement to share with him the proceeds of the SEC whistleblower award that Mr. Block had received, with the express intention that the statement would be published in the newspaper and online, and disseminated throughout the financial community and the world, and as a result would severely damage Mr. Block in Austin, Texas.

78.     The defamatory statements were false and accuse Mr. Block of serious business misconduct, and thus is defamatory *per se*.  Readers of the *Wall Street Journal* would understand it as a statement that Mr. Block intentionally entered into an agreement with Mr. Barnes, and

then deliberately refused to honor that agreement, in an effort to essentially steal $7 million from Mr. Barnes.

79.     The defamatory statements were of and concerning Mr. Block.

80.     The defamatory statements were made with actual malice, because Mr. Barnes knew full well that he and Mr. Block never had a partnership agreement, or any other agreement to share any of the proceeds of the SEC whistleblower award, and Mr. Barnes knows Mr. Block has not yet been paid by the SEC, because Mr. Barnes is holding up the payment with an appeal.

81.     The defamatory statement caused Mr. Block damages in an amount to be proven at trial and in excess of $75,000.

82.     Mr. Barnes, when he made the defamatory statements, acted with gross and reckless indifference for Mr. Block's rights, and the character of his conduct was outrageous.

## Prayer for Relief

WHEREFORE, Plaintiff prays for relief as follows:

a. For compensatory damages according to proof;

b. For punitive damages according to proof;

c. For a permanent injunction enjoining further dissemination by Mr. Barnes of the defamatory statements at issue herein;

d. For costs of suit; and

e. For any such other relief as may be just and proper.

## Jury Demand

Plaintiff demands a trial by jury on all issues triable under Rule 38 of the Federal Rules of Civil Procedure.

Dated: August 25, 2022                    Respectfully submitted,

By:   */s/ Susan W. Roberts*
                Susan W. Roberts, Esq.
                (Texas Bar No. 24127058)
                Charles J. Harder, Esq.
                (*pro hac vice* to be filed)
                Dilan A. Esper, Esq.
                (*pro hac vice* to be filed)
                Emmanuel Fua, Esq.
                (*pro hac vice* to be filed)

                HARDER LLP
                501 South Congress Ave., Suite 150
                Austin, Texas 78701
                Telephone: (424) 203-1600
                SRoberts@HarderLLP.com
                CHarder@HarderLLP.com
                DEsper@HarderLLP.com
                EFua@HarderLLP.com

                *Counsel for Plaintiff*
                *Carson Block*