# Exhibit A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Carson Block, | Docket #23-CV-02483 |
| Plaintiff, | |
| vs. | United States Courthouse<br>Philadelphia, PA<br>September 29, 2025<br>02:05 p.m. |
| Kevin R. Barnes, | |
| Defendant. | |

TRANSCRIPT OF A MOTION HEARING
BEFORE THE HONORABLE JUDGE MICHAEL M. BAYLSON
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For The Plaintiff:
John S. Summers, Esquire
HANGLEY ARONCHICK SEGAL & PUDLIN
One Logan Sq.
27th Floor
Philadelphia, PA 19103
215-496-7007
Email: jsummers@hangley.com

For The Defendant:
Arelene Fickler, Esquire
Dilworth Paxson LLP
1650 Market Street
Suite 1200
Philadelphia, PA 19103
215-575-7108
Email: afickler@dilworthlaw.com

**Audio Operator: Lori DiSanti, ESR**
**Transcribing Firm: Absolute Notary**

**Proceedings recorded by electronic sound recording; transcript produced by transcription service.**

**Index**

| | Direct | Cross | Redirect | Recross | Further Redirect |
|---|---|---|---|---|---|
| **Witnesses For The Plaintiff:** | | | | | |
| **Witnesses For The Defendant:** | | | | | |

| **EXHIBITS:** | **Marked** | **Received** |
|---|---|---|

**SUMMATION BY:**

**THE COURT: Finding**

**(Court in Session)**

**THE COURT: Okay, good afternoon, everyone. Please be seated.**

**MR. SUMMERS: Good afternoon, Your Honor.**

**MS. FICKLER: Good afternoon, Your Honor.**

**THE COURT: Yes, please be seated. Okay, we're here this afternoon for a argument in the case captioned *Block v. Barnes, Cell Action 23-2483*. Present for the plaintiff is John Summers with Michael Mascaindaro of the Apprentice Act.**

**MR. MASCIANDARO: Good afternoon, Your Honor.**

**THE COURT: Present for the event, Arlene Fickler.**

**MS. FICKLER: Good afternoon, Your Honor.**

**THE COURT: Good morning. And with you is Mark Centella.**

**MR. CANTELLA: Good afternoon, Your Honor.**

**THE COURT: Good afternoon, both of you. Hello. And we are first going to discuss a motion that I received this morning called a motion to quash with related to a subpoena that had been served. Ms. Fickler, that was your motion, is that correct?**

**MS. FICKLER: Yes, Your Honor.**

**THE COURT: Alright.**

MS. FICKLER: We... In preparation for this hearing, Mr. Summers and I were engaged in conversation about how best to proceed at the hearing-whether by way of stipulation or live testimony. And during the course of that...those discussions, we both agreed that you would present a live of witnesses. And I-

THE COURT: You mean today?

MS. FICKLER: I am here this afternoon with Mr. Barnes with that purpose. Notwithstanding my agreement to have Mr. Barnes appear here today, Mr. Summers, who had presented me with a copy of the subpoena that he proposed to serve on Mr. Barnes, if we could not agree upon stipulated facts, which is the way I had hoped it would proceed, and asked me whether we would be willing to accept the service of that subpoena. When we agreed to produce a live witnesses I hope that that had mooted the request for a subpoena... subpoena. Mr. Summers did not agree and served Mr. Barnes on Friday afternoon. I had... Friday evening, excuse me, Friday evening around 6:30. I had told Mr. Summers that upon my review of the docu... subpoena, including its request for documents, that I was going to object to all documents. And accordingly, this morning we thought that when Mr. Barnes was served, we prepared the objections we were served this morning, and we also prepared a motion to

quash the subpoena, unless we somehow waive the ability to quash you against the fact that the argument that the subpoena was clearly not served in sufficient time for us to produce the number of documents that were demanded by the subpoena. We are prepared to proceed live today with Mr. Barnes. We have not brought any documents with us in response to the subpoena. There... The demands are, from our perspective, excessive and well beyond the scope of this hearing. And we have not had a reply to objections to that effect, but the motion to quash is predicated on the failure of the absence of time to bring the documents here today.

THE COURT: Great, well, before I hear from Mr. Summers, I was not anticipating any testimony on this. This is a motion to dismiss under Rule 12. That has... that's what's been filed against the complaint that I have here in front of me, that was filed in this court. Now, I am familiar, having read all of the briefs, and I've also read Judge Swain's opinion from the Southern District of New York, that this case has a history of sorts in other jurisdictions. But I really wasn't contemplating hearing any testimony at all, to be honest.

MS. FICKLER: Well, frankly, Your Honor, I thought that you could proceed with stipulating facts.

Clearly, Your Honor has dismissed as moot the aspects of the motion to dismiss, to go to the merits of the claim, and has spoken and has limited this hearing to the motion to transfer, as I understood the prior ruling before this hearing was scheduled.

THE COURT: Right.

MS. FICKLER: And we anticipated, and we, we came here in anticipation of arguing the motion to transfer only. And in that context, I think it is fair to say that most of the facts on which we would rely in arguing the applicability of 1404A, in terms of the desirability of transfer, both for the convenience of the witnesses and in the interest of justice can be found in the documents held... filed in the various... in the three cases that constitute the litigation that has proceeded between Mr. Barnes and Mr. Block over the past of the last several years.

THE COURT: Well-

MS. FICKLER: And, and on that basis, we're prepared to proceed and to just cite to those places in the records. Your Honor, if that's the way you wish to have... to hear it. Mr. Summers, frankly, thought that a hearing... a hearing, which is what Your Honor called... list, list, listed for today required the production of witnesses. And in a such matter as it is the plaintiff's

burden to demonstrate the factors that will support transfer, we came prepared to provide testimony for Mr. Barnes and if Mr. Summers calls Mr. Block to cross, cross-examine Mr. Block.

THE COURT: Alright, well, the motion that you refer to is Docket Number 8-

MS. FICKLER: Yes, Your Honor-

THE COURT: It reads, "The motion of defendant, Kevin R. Barnes, to dismiss or, in the alternative, to transfer."

MS. FICKLER: Yes, Your Honor.

THE COURT: Mr. Summers, what would you like to say?

MR. SUMMERS: Thank you very much, Your Honor. I think there's layers of misunderstanding here. First, Your Honor's order of the end of August called for a hearing. And I'm familiar with a hearing, as being something that's different from an argument. The difference being there's a taking of evidence. The only remaining issue with respect to Docket Number 8 was a request that Mr. Block's first filing here in the Eastern District be disturbed and that the matter be transferred to the Southern District of New York. And the remaining portions of Mr. Barnes' motion was dismissed as moot. After Ms. Fickler and I submitted a reports... reports

**request. So, so as of the end of the summer, what was to be the subject of the remaining issue was a 1404A request. And, Your Honor, as for a hearing, I did what I always do in situations like this, particularly when I'm a good friend of the proposing counsel. I called Ms. Fickler, and I said, what do you... And I did that on the 19th of September. What do you think we have ahead? What are you planning to do? You're, the moving party. And Ms. Fickler said to me, as she said to you today, she said, "Well, I think I'll proceed on the basis of the papers." And I said, "Well, Judge Baylson said a hearing. He didn't say argument." What do you make of that? And we did what good lawyers do in moments like that is we stop talking and we think. And so over the weekend, we thought about that. And we then convened on the 22nd, or at least we then next joined the issue. Rush onto show the sundown. I worked that day and in about three or so, I sent a letter to Ms. Fickler. And I said, look, we got a 1404A and it's attached to a motion. Let's see what we can do about understanding the relevant facts. There are a lot of facts in our judgment. And this is a difference of opinion between Ms. Fickler and us, that there are issues of fact that need to get addressed. And that's why. And we actually fought as lawyers do. We were doing our best to divide the corridor that said hearing**

that there would be factual issues. So, I sent a letter that sent a set of statements attached to her motion. Said, look, here's the things I think we need to figure out and get addressed. Which, Ms. Fickler understood in her motion to be we have a conversation. There might be a need to produce some documents as a result of it. Rosh Hashanah prevailed on Monday night and Tuesday and Wednesday as it, as it always does. And, and on the 24th, on Wednesday, I sent a letter, and I haven't heard anything. And said, hey, look, I haven't heard from you. We, we need this information. And, and we're going to potentially need to get this information in writing. And so, here's a subpoena. Now, we did have a telephone conversation. We did go over things. Frankly, the telephone conversation persuaded me this was not so easy to do by way of any stipulations. And, judge, when one lawyer says to another, I'm going to want some facts. At the end of the conversation, it was, well, you know, maybe we're going to want some facts from you. I hadn't gotten a list of those facts, hadn't been identified. So, I went back and did what hopefully good lawyers do. I went back to the Old Testament, which is the court's order, which said a hearing. And I said, okay, I guess the judge wants live testimony. So, we're going to move forward on the basis of live testimony.

THE COURT: Okay, well, I'm looking at the notice, and it does use the word hearing. I did not intend that to mean that there had to be live testimony. But it is different than an argument. But my thought was that there may be factual materials that would be submitted, because of the fact that this controversy has been in front of two other courts, now this one.

MR. SUMMERS: So, if I may, let me just now turn to another aspect. And if we haven't had the opportunity to respond to this, we got this this morning, the motion to quash. A very disturbing thing happened. We had... gave notice on Wednesday that we're going to be serving a subpoena. Please accept service. It's the rare moment in my life when a, when a client on the other side doesn't allow the lawyer to accept service.

THE COURT: Well, is this the, there was this saga in some papers about somebody was following Mr. Barnes, I think.

MR. SUMMERS: We'll get right to that, Your Honor, and I've got a witness with respect to that. Okay. We said we want to have a subpoena because we want documents. So, although the gracious offer to have the witnesses appear, Mr. Carson, came... Mr. Carson's Law came all the way from Austin, Texas to be here. And Mr. Barnes just drove down from Malvern. We, we said, look,

we need the documents. So, we need a subpoena. So, we did what you do in America in a federal court, which is you arrange to have a subpoena served. Now, for reasons I'm going to explain relevance of, which is for some reason, Mr. Barnes does not want to be in this court. And he went so far as to do what I'm about to explain, because for reasons I don't really know, and frankly, I think we need to have some time to explore in more detail. He didn't want to. So, I have somebody here from the rapid courier service that handled the delivery. There was a fellow named Carlos Santiago who did the service. He's not here today. Do you know why he's not here today? He's not here today because Mr. Barnes yelled at him, pinned him into his car-

THE COURT: Mr. Summers, we're getting off the point. Look, I have prepared some questions I want to ask counsel. I would like to ask my questions first that relate to the substance of this case and where it should proceed, whether it should proceed here or whether I should transfer it to the Southern District of New York. Correct? And I'd like to proceed. I'm not... Look, you're both very good lawyers. I've known both of you for a very long time, and I respect both of you and your service to your clients. Your expertise and your reputations are outstanding. Okay? So that's where I'm

starting from. I'd like to ask my questions and get answers to them, what your position is. And what I usually do when I ask questions at oral argument is I give counsel a few days after the argument to file something, if you want to, to either back up what your argument was or cite cases or something like this. And in this situation, you can tell me whether you think either one of you think that there should be documents submitted or testimony. And I'll consider that. But I'd like to ask my questions first. Is that okay?

MR. SUMMERS: We are, under the rare circumstances with, with the Judge asking you whether its okay, of course it's okay.

THE COURT: All right. All right. Thank you. So, the first question I have is, is this case a continuation of a prior case? There's some discussion about that in some of the cases you've cited. I know there was the case in Texas that was dismissed, and then the case in Southern District of New York, which I will from now on abbreviate as SDNY. You all know what that means. And then there's this case. So, what Mr. Summers, what is your position as to whether this case is a continuation of a prior case?

MR. SUMMERS: This case is a continuation of a Western District of Texas federal court case that

was filed on August 25, 2022. It is not a continuation or related to the SDNY case. If the court will allow, would you like a brief explanation?

THE COURT: Briefly.

MR. SUMMERS: The, August 25, 2022 Texas complaint is a defamation case. It's based on the defamatory statements of Mr. Barnes, that were appeared in articles in July 28, 2022, and July 29, 2022. The SDNY case is not a defamation case. It's a case in which Mr. Barnes says that there was some kind of agreement that was made with Mr. Barnes. The SDNY case, Your Honor, was filed after the Western District of Pennsylvania case, he filed a complaint-

THE COURT: Western District of Texas, you mean?

MR. SUMMERS: Yes. He filed the... this SDNY complaint on September 26, 2022, after he did file some kind of New York summons with notice, which is a little akin to Pennsylvania practice, it’s a writ and we cited cases to the court that that's not first filed under first file principles. And so, the Western District of Texas case proceeded. It was the subject of litigation. There was a report recommendation March 30, 2023, in which a magistrate judge concluded that Mr. Barnes was not subject to personal jurisdiction in Texas.

Texas is where Carson Block is from. And so, Mr. Block decided, look, I want to cut through all of this procedural wrangling. Let's just kind of move along on things on my case. And so, we filed the Eastern District of Pennsylvania case June 28, 2023. That's this one. And I think a fair lineup of the prose, P-R-O-S-E, in the Western District of Texas case and Eastern District of Pennsylvania case will prove that, although myself and my good colleague Mark Aronchick are counsel in that case, that is the Eastern District Pennsylvania case, it looks an awful lot like is essentially the same as the Western District case and it's the same claims. It's about the same articles. It's a defamation case. It's a continuation. And my goodness, if there's ever a moment where a good deed may go punished, here he went ahead and he filed to get rid of all the procedural wrangling so that as of June 28, 2023, we can move forward on the case where we don't have any issues about personal jurisdiction. Mr. Barnes complained that in Texas there was no personal jurisdiction over him. The court signaled to the magistrate that's where it was going. And he said, okay, we're not going to keep litigation. We just want to move forward with our case.

THE COURT: Let me hear from Ms. Fickler now.

MS. FICKLER: Your Honor, we take the opposite position in several respects. First of all, we believe that the filing of Mr. Barnes' actions in Supreme Court of New York was of a summons, with notice, is the commencement of the first litigation between these two parties. And it was... indeed, it was the filing of that writ of summons that precipitated the article.

THE COURT: Well, excuse me, is the writ of summons in New York filed or is it just served?

MS. FICKLER: It is filed.

THE COURT: Okay.

MS. FICKLER: And it's available in our public record. It became a matter of public record. It gave rise to inquiries from the press to Mr. Barnes. The inquiries in the press to Mr. Barnes resulted initial... resulted in articles in the Wall Street Journal that gave rise to Mr. Block's claim against Mr. Barnes for defamation. The order of, of filings, if you will, is that Mr. Block, Mr. Block responded to the summons with notice by filing a notice of removal to take it to the Southern District of New York. He did that before he filed his action in the Eastern District of Texas... Western District of Texas the next day. Upon the receipt of the notice of removal, Mr. Barnes filed a complaint in the Southern District of New York. We believe under the

relevant authority that the, the, the New York litigation comprised of the two actions, the one in first in Supreme Court and then in the Federal District Court constitutes a single action and therefore they should date back to the filing of the writ of summons. But beyond that, we contend that this litigation, while in many respects analogous to, comparable to, arguably even close to a copycat of the, of the Texas litigation, is in fact not a continuation of it. Because Mr. Block filed his action here before the action in Texas was dismissed. He did not move to withdraw the action and say I'm going to file in Pennsylvania. He rather said, he rather filed directly and indeed he elaborated on the claims here in Pennsylvania beyond what he had filed in Texas. The theories were the same, but the, but he added an article from Bloomberg that was not in the original action in the Western District of Texas. Finally, the... the, the... when he filed the action here, he, he con... he contended that the two cases should be litigated together. He made that, he made that argument in the, he, he, he, he submitted letters to the court in New York saying the two cases should be litigated together. He, he, he, he, so averted in his pleading in this case and yet he has never moved to transfer. And so, we think that it's appropriate in light of our efforts to expedite these cases by filing

a motion to transfer, to move this case to New York, that that's the appropriate way to proceed.

MR. SUMMERS: Your Honor, one slight correction.

THE COURT: Briefly.

MR. SUMMERS: In this case it was never presented to you that the case should not proceed here. There was a statement, because it hasn't been, it was only recently decided that the Southern District case, there was no personal jurisdiction over Mr. Block, as well as that their claim should be dismissed. So, when we originally filed the papers in front of Your Honor, we said, hey, this is the court that has jurisdiction over everybody. Mr. Block concedes that both have jurisdiction here. Mr. Barnes lives, Barnes lives here. It's easiest to proceed in this way. And the position that they could go together was they could go together easily here.

THE COURT: All right. My next question is what state law should apply to this case? Let's start with, if the case proceeds in this court, what state law should apply? Ms. Fickler, do you have a view on that?

MS. FICKLER: Your Honor, we believe that New York's law gov... governs both the defamation claim... both the original claim in New York and, and the claim in the defamation hearing in the Easter District of

**Pennsylvania. And that's the point in fact that I wanted to make, and, and, and in speaking, I failed to include it in my latest answer. There's more that ties these cases together. The thrust of the claim in defamation is that the statements that Mr. Barnes made to the press about the case in New York were false. In order to prevail, on the... on that claim in defamation, he had... Mr. Block has to demonstrate that in fact there was no argument, agreement, excuse me, consistent with Mr. Barnes' view of the agreement between the parties. Clearly there's a disagreement among them about what the agreement was. But there was an agreement, and that's what the court is going to have to decide, both in the Southern District of New York, and in this case proceeds separately. In this case, in order, in order to first to decide whether or not Mr. Barnes is entitled in this case in the Southern District of New York to any recovery, and whether in this case if he's entitled to that, to that recovery, then what, then what he said to the press is clearly not defamatory. And if in fact he doesn't prevail, then they're going to have to prove that the statements were somehow maliciously stated, and, and maliciously and falsely stated, but you're still going to have to re-prove... prove the falsely. So, we believe that there's a significant overlap, notwithstanding the differences in theory, and a**

**slightly broader scope of this litigation. I believe, Your Honor, that as far as the underlying question of whether or not there was an agreement between Mr. Barnes and Mr. Block, that that is an issue that will have to be governed by New York State law, in large measure because it focuses on a meeting that took place in New York, and that was follow... and that, and that and then resulted in liti... in, in the parties proceeding in New York, and in Thailand, and in California. But I think that claim arises under New York law.**

**THE COURT: Alight-**

**MS. FICKLER: And, and the parties had multiple meetings in New York.**

**THE COURT: Mr. Summers, what's your view as to what State law applies?**

**MR. SUMMERS: Without a doubt, Texas law applies. Our brief at pages 16 to 18 provides the basis for that. And there's no greater authority for the proposition that Texas law applies than this Court's decision in the *Wood Services Incorporated v. Stills Ability Advocates, 342 EPSA III, 592, 2018*.**

**THE COURT: Well, I have that, I have that opinion right here.**

**MR. SUMMERS: Okay. And in which?**

**THE COURT: In which your firm represented**

one of the parties.

MR. SUMMERS: I beg your pardon?

THE COURT: Your firm represented one of the parties.

MR. SUMMERS: It's partly yes, Your Honor, that's how we know about the case as well as some elbow grease into a legal research.

THE COURT: Alright.

MR. SUMMERS: But this one was easier, and the general proposition is that the domicile of the plant... of the defamation plaintiff is that the... that State law applies. Mr. Block is from Texas. QED, it's just not that complicated. That's proposition one. Proposition two, there is a substantial misogyny that's going on of the characterization of what the defamation claims. Now, the defamation claim is that two statements made, one in each of the two different articles, was false and defamatory. And I'll give you an example, and it's important details matter, Your Honor. One of the defamatory statements is, there is no explanation for why the SEC recognized Mr. Barnes as an author of the report and noted his claim, but did not compensate him with part of the award. That's not some New York State law question about the existence of agreement. The next sentence, even more than that though, Carson Block used Mr. Barnes and

his work to obtain the windfall. That's not some New York law question. Look, what I think is partisanly going on here, Mr. Barnes doesn't like the fact that the SEC gave a $14.5 million whistleblower award to Mr. Block, not him. He challenged that. He challenged that SEC decision in the Third Circuit, upstairs, and he lost.

THE COURT: I read that.

MR. SUMMERS: And he lost in a panel with, with Judge Sirica and, and several others. And so maybe that's why he doesn't want to be in this courthouse, but, but it's, it's not as if there is New York laws that apply to these defamatory statements at all.

THE COURT: Okay. Alright, next question. Now, this case is a single case... a case with a single count of defamation. The New York case has multiple counts in it. How does that impact my decision as to whether this case is "similarly situated" to the New York case? Ms. Fickler, do you want to answer that?

MS. FICKLER: I'm sorry, Your Honor, I didn't hear-

THE COURT: Well, the question is, since, since your complaint in New York is a multi-count case, no, multi-count complaint, and this, and I don't think defamation is one of those counts.

MS. FICKLER: It is not. We did not make a

**claim for defamation.**

**THE COURT: Right. Now, in this case, there's a single count for defamation. Under those circumstances, can I say that this case is similarly situated to the New York case?**

**MS. FICKLER: Oh, absolutely, Your Honor.**

**THE COURT: Well, why?**

**MS. FICKLER: Because I disagree with Mr. Summers' characterization of the overlap of the cases. First, of all, the comment that Mr. Summers quoted was not a quote from my client, but rather from his counsel, just for the purposes of the record. It... and it, it is an advocate's statement with respect to why Mr. Barnes believes that, notwithstanding the SEC's and the Third Circuit's decision that only Mr. Block should receive the full Whistleblower Award, that he is entitled to half of that award under the oral agreement that he had with Mr. Block. That oral agreement is the one that is at issue in the Southern District of New York, and will inevitably be at issue here in order to address the accuracy of the statement that... about which Mr. Block contested... complains. Now, there are five counts because we, in fact, asserted alternative theories as to why Mr. Barnes is entitled to the, for sure, the Whistleblower Award. We believe directly in terms of the agreement, but we plead**

**in the alternative theories, equitable counts such as unjust enrichment. And we think that there's no... the fact that there are different theories of recovery should in no way impact what the trial is going to be in that case or the trial in this case.**

**THE COURT: Yes, sir.**

**MR. SUMMERS: Your Honor, putting people are different with these cases. The way to start is with the text. Look at the complaint in the Texas action. Excuse me. Look at the text in the Southern District action. Look at the text in the Eastern District of Pennsylvania action. The action in the Southern District of New York, I have the original complaint. The first cause of action is unjust enrichment. The second is constructive trust. The third is breach of fiduciary duty. Those have nothing to do with as legal claims. They bear no historic relationship in the history of the common law. They have no similar elements to defamation. There's a single cause of action for defamation in the Eastern District of Pennsylvania. But just judge, it's not just that the causes of action are completely different, but the injury. Look, in a world where we're being charitable to Mr. Barnes, the reported injury to him is that he supposedly participated in an investigation that turned out to be successful. And he says there was a shake of a hand or**

some kind of agreement over breakfast with Mr. Block. Now, that's just not true. That is a complete and utter fabrication. But assume for the moment it is true. That has nothing to do with the defamatory... the defamation of Mr. Barnes. And this let me be really clear. What makes this defamatory is that Barnes is going around saying that Block breaks his word. Block is in a business where you can't have a reputation that you break your word. And so, a significant part of the Eastern District case is going to go to what the nature of the injury is, why he's injured, the causal relationship.

THE COURT: Well, suppose the Southern District of New York case had been a one single count for breach of contract, a breach of a verbal contract. Would that have been different?

MR. SUMMERS: No.

THE COURT: Not at all?

MR. SUMMERS: I mean, still. I mean, you'll allow, Your Honor, that's not what this is.

THE COURT: I understand that.

MR. SUMMERS: It, it’s it's totally different, but it involves all kinds of things. It's not defamation. Defamation, I mean, like, it's just different areas of the law. I mean, if you just think about first year law school.

**THE COURT: So, you're saying that your client would have a claim for defamation even if there was a contract between the parties?**

**MR. SUMMERS: Yeah.**

**THE COURT: Is that right?**

**MR. SUMMERS: Yes.**

**THE COURT: Okay. Ms. Fickler, what's your response to that question?**

**MS. FICKLER: I don't think Mr. Block has a claim for defamation because the fact if there was a contract between the parties-**

**THE COURT: No, I understand that.**

**MS. FICKLER: Then, then he's at Mr. Barnes. The, the quotes that are allegedly defamatory that are attributed to Mr. Barnes, in fact, are consistent, are consistent with the fact that there was a contract. That's what we, that's what we have said all along. And indeed, in Mr. Block's complaint, in this action, in paragraph 104, where he's arguing for the New York and Texas actions to proceed together, he states in subparagraph D the following reason. The allegations presented in Mr. Block's Texas complaint, which we've heard are comparable to, it's likely less than those here in Pennsylvania, and Mr. Barnes' New York complaint substantially overlap, as do the parties' defenses.**

THE COURT: Well, is overlap the same as similarly situated?

MS. FICKLER: I believe so, Your Honor.

THE COURT: Okay. Next question. Has any Discovery, did any Discovery take place in either Texas or SDNY? Ms. Fickler.

MS. FICKLER: Your Honor, no Discovery took place in Texas. In the Southern District of New York, when the district court dismissed Mr. Block's motion, or denied Mr. Block's motion to dismiss for lack of personal jurisdiction over him in New York, the case was referred to a magistrate judge. And since then, the parties have entered into case management orders and approved by the court, exchanged initial disclosures, which demonstrate that, in fact, the witnesses in that proceeding are, the only witness there that identified as having any Pennsylvania connection is Mr. Barnes, and only he identified himself, Mr. Block did not. So, the initial disclosures have been exchanged. The... Each party has filed an interrogatory request for reduction from the other.

THE COURT: You mean serve, serve, serve, serve them.

MS. FICKLER: Serve, yes, serve, serve. Excuse me, Your Honor. Serve the Discovery on the other,

**and the parties are in the process of preparing their responses to those discoveries. In the context of preparing those responses, the parties are negotiating over what is appropriate electronic information, that need... electronically stored information to be shared by the parties, and a confidentiality order has been entered. All of that has happened within the last six weeks since the motion to dismiss was denied. No depositions have yet been taken. And the, and Mr. Barnes' documents, which have been here, have been given to his attorney in New York so that they will be made available for reduction to Mr. Block in response to the document's request to be sent non-objectionable.**

**THE COURT: All right. Is that accurate, Mr. Summers?**

**MR. SUMMERS: I don't... I'm not up on the details of, of the, where things are in New York, frankly, because it's a different case. So, there would be no need for that because this is a different case than that one. Whether there has been a rush by Mr. Barnes since Your Honor's late August order, let's move things along so we can get some footprints on the ground for moving forward with Discovery, I'm, I'm not sure. I know there was also some judicial involvement, so I don't know. I think what you heard, though, was that answers to interrogators and**

documents have not been exchanged. I certainly know that, and I will endeavor to find out more details after the court's hearing today.

THE COURT: Yeah, okay. Next question. It was referenced before to the Wood Services case, which part of that deals with what is referred to under New York law as an anti-SLAPP provision. And the question I have is whether that's a substantive or procedural issue, if either of you want to take a position about that. Mr. Summers?

MR. SUMMERS: I believe, Your Honor, our briefing covers this.

THE COURT: Yes, you covered it.

MR. SUMMERS: Okay.

THE COURT: Okay,

MR. SUMMERS: So, what did our brief say? I think, Your Honor-

THE COURT: You don't have to answer that. You just want to rely on what's. I think you took the position there that it was procedural.

MR. SUMMERS: That’s what, that’s actual is what I want to say-

THE COURT: But, I’m not sure if that’s exactly what you argued in the Wood Services case.

THE COURT: Ms. Fickler, do you have a view

on that?

MS. FICKLER: I, I also know that we briefed this at, at the time of the original motion to dismiss the discretion substantive allegations of the complaint. And I have a recollection that we took the position that while the procedural elements of the New York anti-SLAPP rule in terms of timing and thing... and things like that are procedural, the concept of whether or not a claim for defamation attributable to a statement that involves a matter of public participation is in fact substantive. I have not looked in several years at the issue of where the Second Circuit stands on that issue. I know that at the time we were briefing this, I looked at it then, and I don't remember how it... where it was. But my, but my sense is it’s a sense is it was then a confused issue, and I don't know whether it's been clarified. I will say that here in Pennsylvania, there's a new Pennsylvania anti-SLAPP statute, which from my perspective unfortunately doesn't apply to Mr. Barnes... Mr. Block's claim to defamation because it only applied to hereafter, thought, there after thought, that actions that were filed after the Pennsylvania legislature passed its new anti-SLAPP law. But that law clearly, if it were applicable to this case, would also result in the dismissal of Mr. Block's claim.

MR. SUMMERS: Your Honor, I have two options. One option is that my colleague Mr. Masciandaro can briefly respond and elucidate this. But... and we would also like to just be able to be in a position to put something in writing about it.

THE COURT: I said that. You can do that. We'll talk about that when I'm done. Okay, next question. To what extent is the convenience of any party a relevant factor in the issue presented? I use that because I believe the Statute Section 1404 refers to the convenience of the parties. And I am aware that New York and Philadelphia are only 90 miles away. But I'm going to ask the question anyway if you have a position on it. Yeah, Mr. Summers?

MR. SUMMERS: Yes, the convenience matters. Yes, it cuts in the following way. Mr. Barnes presumably drove down from Malvern today to be here. And he'll be able to participate in the case here without having to get hotel rooms, without having to take trains, buses and the like and will have the benefit of the outstanding representation of Ms. Fickler. Mr. Block travels from Austin. He's of the view which Philadelphia hotels are cheaper than New York. Life in Philadelphia is cheaper. Yours truly is cheaper than council in New York. And it's actually easier to get in and out of the

Philadelphia airport than go through New York. So, he's happy to be here. And so, it's hard to imagine how it would be any easier for Mr. Barnes to be in New York than here. And we're here to satisfy Mr. Barnes disinclination to be in Texas. So, a favor was done to be here. And Mr. Block is fully prepared to proceed and be here.

THE COURT: All right, well, if I understand that, in Texas, while the case was there, that was purely legal motions and argument. There was never any live proceeding before a judge in Texas. Is that correct or not?

MR. SUMMERS: I understand that to be the case.

THE COURT: All right, Ms. Fickler, do you agree with that?

MS. FICKLER: I do agree with that.

THE COURT: All right, thank you. All right, now, next question.

MS. FICKLER: May I answer the last question, Your Honor in terms of the convenience of the party?

THE COURT: Yeah, sure. Sorry. Yes, go ahead.

MS. FICKLER: Not surprisingly, you take a

**different position. Our... There, there is not a significant difference between New York and Philadelphia in terms of travel for Mr. Barnes. In terms of Mr. Barnes, he goes to New York regularly. He is going to be required to go to New York regularly in order to litigate the case that he has brought against Mr. Block. From our perspective, the issue of convenience of the parties and the witnesses, relates to whether or not depositions need to be taken twice. And, and, and Discovery needs to happen twice over the same evidence. And we suggest that it is best to consolidate the cases. In terms of... That, that's what part of... a factor to be considered in terms of the convenience of the parties and witnesses. We don't want to have the same third-party witnesses. We have to be deposed both in New York and in Philadelphia. And so, from our perspective, that concept of convenience includes the issue of traditional economy that merits bringing the cases together. And if Mr. Barnes likes me as a lawyer, he doesn't want to pay for two sets of lawyers.**

**THE COURT: That's an important fact. Mr. Summers, what's your answer to that?**

**MR. SUMMERS: Well-**

**THE COURT: You assume the case in New York would... if I decided to keep this case, you presume the**

**case in New York would continue. Correct?**

**MR. SUMMERS: Yes, it would continue. But let me just step back.**

**THE COURT: And what about Ms. Fickler's argument about-**

**MR. SUMMERS: I will address that. Let me be clear. This is the first time I've ever heard that we now have not just a 1404A transfer, but we have a consolidation motion. Okay? There's no request for consolidation.**

**THE COURT: Well, that would be up to-**

**MR. SUMMERS: Now here's, here's-**

**THE COURT: Wait, wait. That would be up to the judge in SDNY. If I transfer the case to there, then that judge could consolidate them or could not. I would have no control over that.**

**MR. SUMMERS: Here's the way I see it, Judge. Should there be some form of coordination of the cases? Sure. In the first instance, who would be doing that coordination? Counsel would do it. Are there some kinds of depositions that might be admissible to both? Sure, that's possible. In the first instance, there could be agreements and briefs. And it would also be in the nature all the time, judges coordinate cases where there may be some overlap of certain kinds of things.**

So, so, of course we recognize that there would be... there is a New York case. Mr. Blocks was unsuccessful in having that-

THE COURT: Well, you see - excuse me.

MR. SUMMERS: Go ahead.

THE COURT: You know, we have cases in this court where two more judges may have similar issues. Okay? And sometimes there is overlap. It happens, well, it happened this morning, for example. There was a criminal case in which the defendant had appeared in front of me some time ago, and there was a violation of supervised release penalty. And at the same time, well, not at the same, but that subsequently the same defendant had committed a new offense, which was in front of a different judge. So, neither one of us district judges had the power to preempt the other one. In a situation like that, we would go to the chief judge, and the chief judge either would, by agreement or discussion or decision, decide which judge should continue with the case. Now, in civil cases, that, I'm not sure that happens the same way. I don't know. But I think Ms. Fickler has a valid point that it's easy to say there should be coordination, but unless some judge in New York decides to do that and enforces it, that there may not be, and it could end up with multiple depositions of the

same witness.

MR. SUMMERS: Well, I don't see how that's possible, Your Honor, because any time there was a request to do that in an appropriate way, there would be a motion, and it would go in front of the court to review its term. Look, let me step back for a moment.

THE COURT: Yes.

MR. SUMMERS: First file, that is a strong signal that the case should stay here. Meetings of the parties with respect to location, again, that cuts strongly here. Is it the case, that there is a pending case in the Southern District of New York? There's not a complete identity of the parties. Mike Waters, is a... which is Mr. Block's company, is a party in New York and is not a party to this action, not a party to the defamation action. But, but deference is paid to a party in their selection on the forum. Now, would the, would the parties and the lawyers work together to have it proceed as efficiently as possible? Is it easier for that to happen because we live in a world with Zoom than otherwise? Absolutely. I daresay, Your Honor, Your Honor and Chief Judge Swain surely could work through whatever the issues that were presented with respect to coordination. So, I think that is a, that is a that's an effort to make an argument that feels like a lawyer's

argument to me. It's made when you're trying to deny someone the forum that they chose. And Mr. Block wanted to be in Texas because Texas law applies. He was defending in Texas.

THE COURT: That's over.

MR. SUMMERS: Well, that's right, the way of the world is second best now.

THE COURT: All right, Was there an appeal taken from the decision?

MR. SUMMERS: No, because he wanted to move on and get to the substance of his defamation case. So, he, so he continued the action here. That's why he did it. So that's what he wants to do. And frankly, we're here with more of more procedural wrangling, rather than just let... They dropped all their 12B6 and other legal arguments. Let's get going and work on this case. We can, we can move this thing along. It's not that-

THE COURT: Well, I'm not sure Mr. Barnes has dropped his 12B6 position.

MR. SUMMERS: Well, I believe, Your Honor, there's a... I may raise his hand later in Rule 56 or other things. But I believe that with respect to the pending motion, you got a report. You got a status report.

THE COURT: Yes.

MR. SUMMERS: It said that all those claims are moved. The only thing outstanding is the 1404A request.

THE COURT: Is that right, Ms. Fickler

MS. FICKLER: That is not right, Your Honor.

MR. SUMMERS: Is that wrong?

MS. FICKLER: That is wrong.

MR. SUMMERS: Okay, then I... forgive me, I thought that was-

MS. FICKLER: Indeed, I suggested that we stood by our arguments with respect to the motion to dismiss. But; that we preferred to have the issue of transfer resolved first. I think I have...

MR. SUMMERS: I will stand with whatever the status report is. If I misunderstood, I misunderstood.

THE COURT: Okay, all right.

MS. FICKLER: And, and the court did, did dismiss it. And I would, at the time, misunderstood what I was saying. But hopefully I have not.

MR. SUMMERS: Okay. That, that-

THE COURT: Well, I will check the record.

MR. SUMMERS: The source of my confusion was that...

THE COURT: All right, I have another question. To what extent does each party depend on introducing into evidence statements that were quoted in the Wall Street Journal or Bloomberg? And is this issue relevant in terms of where this case should proceed? Ms. Fickler, do you have a view about that?

MS. FICKLER: I-

THE COURT: That is, these were statements that allegedly were made by Mr. Barnes to various media outlets. And assuming Mr. Summers is able to verify that those statements were made by your client, I don't know if he will depose the reporter or he'll take a 30-B-6, that, you know, the, the media, whether it's the WSJ or Bloomberg, accurately reported. Because they're basically hearsay. So, so that's a question I just have in where how you're going to go about proving that and whether that would make any difference whether the case was here or in New York.

MS. FICKLER: I think Mr. Barnes... Mr. Blocks burden to prove the-

THE COURT: Yeah.

MS. FICKLER: Statements and to prove that they were defamatory. And from my prospective-

THE COURT: How are you going to prove that? Well, you first have to prove they were stated by

the... Mr. Barnes.

MS. FICKLER: Yes, he would.

MR. SUMMERS: So, I...

THE COURT: And suppose you take Mr. Barnes' deposition, he denies making those statements. Then what do you do?

MR. SUMMERS: Then we'll depose the reporter.

THE COURT: And suppose the reporter refuses to answer his First Amendment. I won't have to justify my reports. The media are very suspicious of civil litigation, as you know. Now, maybe you could get by, by just introducing the article into evidence as showing that a statement was made. And then it's up to you to prove that it's false.

MR. SUMMERS: Here's what I think happened.

THE COURT: Yes.

MR. SUMMERS: And I don't have the facts, yet. I think Mr. Barnes, who lives and works in Philadelphia now, from his home office, picked up the phone and either called on his own or received a call from his people in Pennsylvania. I don't know that. But that's what I would guess. And I'd be interested to know whether that's wrong. And, if I may, and I... and, and one of the people... So, what did Mr. Barnes say to at

least one of the reporters? It may not be both. There's also a communication with a reporter from Mr. Barnes's lawyer. Who is... so we'd be deposing Mr. Barnes's lawyer, who acted, we would say, as the agent in making the defamatory statements. So, I, I confess, Judge-

THE COURT: Yes.

MR. SUMMERS: You're way ahead of me in thinking through precisely how I would try and prove each of the defamatory statements. And, but, But, for sure, I would be deposing the people who are quoted, Barnes and Slarsky. And, for sure, I would try to go ahead and speak with the other reporters and I don't know what else I would tell them.

THE COURT: Well, we know there's a limitation on the obligation of a witness to appear at a deposition. I think it's 90 miles. Am I correct about that? Maybe less.

MR. SUMMERS: Well, I think, Judge, there are... First of all, one's in Virginia, one's in New York. We could, we could-

THE COURT: Well, you don't think it makes any difference whether this case proceeds in Philadelphia or New York as to being able to get live witnesses.

MR. SUMMERS: Correct.

THE COURT: All right, Ms. Fickler, what's

your view on that?

MS. FICKLER: I think it clearly makes a difference to the reporter for the Wall Street Journal who resides in New York. I think that with respect to the reporter for Bloomberg News, his employer is in New York, and I would assume would probably want to be there to defend any deposition. And so, I think it would probably be much easier on the parties if those depositions were to take place in New York, as we suggested happened in the context of a... the two cases being litigated together.

MR. SUMMERS: If I could, Judge?

THE COURT: Yes.

MR. SUMMERS: We are focusing on a speck on the carpet with respect to the significance of those two witnesses. A tri... Did the Discovery in this case-

THE COURT: Well, I'm not sure it's a speck on the carpet. I think it could be very important in terms of getting live witnesses in front of a jury in terms of where they appear, or a videotaped deposition, perhaps.

MR. SUMMERS: We'll accommodate anyone who's not within the requisite number of miles here. But there are going to be a lot of, a lot of witnesses, and the evidence is just going to be an expert just about

**damage to reputation, the economic damage. There are going to be witnesses that goes to Mr. Block's reputation. There are going to be a whole series of witnesses where we're going to have the primary bad actor here.**

**THE COURT: Allegedly. Allegedly.**

**MR. SUMMERS: The alleged bad actor.**

**THE COURT: Yes.**

**MR. SUMMERS: Fair enough, but we think, fine, the alleged bad actor is Mr. Barnes. May I make one point of order?**

**THE COURT: Yes, sir.**

**MR. SUMMERS: And I apologize just for pausing.**

**THE COURT: That's all right.**

**MR. SUMMERS: Out of the courteousness, we have here, if Your Honor, wants to hear H.E.A.R., Ms. Wall, who is... who supervises Carlos Santiago, who's the person who delivered-**

**THE COURT: No, I don't think I want to get into that. We'll talk about that in a minute.**

**MR. SUMMERS: Okay. She has to leave at 3:30.**

**THE COURT: That’s fine.**

MR. SUMMERS: And I promise, she has to be out by 3:30.

THE COURT: Well, thank you for being here, but I'm not going to get into that issue today.

MR. SUMMERS: Okay. I said I can't speak for her. I said the judge-

THE COURT: Okay. Fair enough. Okay. All right. Now, this is another question. Is it correct that the $14 million reward was actually paid by the SEC to Mr. Block? And if so, does he continue to hold that money in funds that are segregated in any way?

MR. SUMMERS: I don't know the answer to that. Do you want me to try and find out now or follow up to you?

THE COURT: Well, you can follow up, but let me just say this. That I don't want to... If I decide to keep the case here, I don't want to hear that Mr. Block took that $14 million, say, as of September 29th, he had in a bank account or a treasury bonds or whatever, and then used it to buy an airplane or a distant island so he no longer has the money. Ms. Fickler, is that any concern of yours?

MS. FICKLER: Of course, Your Honor.

THE COURT: So, what I, I would like to see here is some agreement, Mr. Summers, that your client

**will segregate that money and not dispose of it while this case is pending. And I don't, I don't know why Judge Swain... Did she ever mention anything like this or not?**

**MR. SUMMERS: Let me just say... Let me... I understand the court's question. I'll follow up. I'll point out that he took some legal resources that are substantial, not to me, but to the lawyer that was involved in that case. So, the net proceeds from the whistleblower reward is not $14 million.**

**THE COURT: No, I understand. There was a contention fee paid to Mr. Block's lawyer.**

**MR. SUMMERS: Let me... I will... May I just... May I just follow... I hear you 100%, I'll get back to you.**

**THE COURT: Yeah, sure. All right. I think there was some mention before about the Third Circuit's opinion denying Mr. Barnes's appeal from the SEC. Does that decision have anything to do with this case or this issue? Either one of you.**

**MR. SUMMERS: In part, yes. One, it goes to one of the false statements that were made on behalf of Mr. Barnes. That was one of the lawyers said something to the effect that the SEC didn't explain and that the suggestion that the SEC award was a windfall and**

the suggestion that there was no explanation for why the SEC did what it did. Hold on one moment. I can get the language. Kevin Barnes said, "He worked with Mr. Block on a report on focused media holding that formed the basis of the SEC action and that the two had agreed to share proceeds from the legal or regulatory actions stemming from their research." Hold on one second. And then, that was the article quoting Mr. Barnes in the Wall Street Journal. And then the next day, Mr. Barnes's lawyer says, quote, "There is no explanation for why the SEC recognized Barnes as an author of the report and noted his claim but did not compensate him with part of the award." I mean, the SEC did the opinion from a judge. And then Chief Judge Chagares explains that Mr. Barnes wasn't eligible to receive the a... the award. I mean, it's it, an, an, look...

THE COURT: Well, that's an appeal from an administrative agency, correct?

MR. SUMMERS: Correct. Yes, yes, yes. And I don't Judge, I'm going to scratch my head trying to figure out why Mr. Barnes is doing everything to not be in his home location. Okay? He lost in the Third Circuit. This case could someday be in the Third Circuit. He doesn't want to lose in the Third Circuit again. That's, that's Summers' conjecture, okay? I

don't know. I haven't had a chance to depose him. I haven't had a chance to do it. But it sure seems, sure seems remarkable that he's fighting his heart not to be here where it's his home state and Mr. Block has flown all the way in from Texas to be here.

THE COURT: Well, that's atmospheric. You know, Mr. Barnes may have reasons for his position. I'm not going to penalize him for that because he lives in Melbourne. Okay. Ms. Fickler, do you have any response on that issue about the Third Circuit prior opinion, whether that's at all relevant?

MR. SUMMERS: And to be clear, just so there isn't any questions, I understand that the ground for Mr. Barnes' disallowance, the affirmance of the SEC, was because there were certain paperwork that needed to be filed to demonstrate certain things and he didn't comply with whatever his obligations were. I don't even know that that's suggested. Had he complied, it might have been a different story. I have no reason to think that's the case. But that's, I think, the gist of Mr. Chagares decision.

THE COURT: Yes, ma'am.

MS. FICKLER: And our view was that, in fact, Mr. Block, by virtue of the agreement between Mr. Barnes and Mr. Block, the work on the FOCUS Media Report

**Convention resulted in the SEC's decision. It included both the agreement that the proceeds of regulatory action would be divided. And so, therefore, whether it went to only to Mr. Block alone or had been divided by the SEC would not have impacted their eventual obligation to, if you will, reconcile what was due to each of them under the terms of their agreement. We also alleged in the Southern District of New York that there was an obligation on behalf of Mr. Block to fairly treat Mr. Barnes in terms of the representations that he made to the SEC. And we're not certain that he was fair in that regard. That may be one of the reasons that counsel for Mr. Barnes made the statement he made in, in, in the quoted article. I think that there, there may be a, a... There's clearly the relationship that the SEC, paid agreed to, end up paying Mr. Block, Mr. Block. And we're challenging... We, we think that we're entitled under the parties' agreement to a piece of that. And that's what we're seeking in New York.**

**THE COURT: Okay. Fair enough. All right.**

**MR. SUMMERS: May I make just one more-**

**THE COURT: Yes, briefly.**

**MR. SUMMERS: There will be a theme that we will develop that Mr. Barnes... If you will, I'll keep saying allegedly. That Mr. Barnes was allegedly... He**

**was just a bit player in this whole FIRST FOCUS media investigation. He didn't even speak.**

**THE COURT: Well, I know that's your position.**

**MR. SUMMERS: And that, that really, this was... this is just a shakedown effort. This is a shakedown effort of Mr. Block. And he tried to do the same thing with respect to the SEC.**

**THE COURT: Well, Mr. Summers, most defense lawyers and their clients think that every lawsuit is a shakedown effort by a plaintiff to get money they don't deserve. That's a frequent allegation here. But I'm not... I can't give credit to that. That's... He has a right to... Mr. Block, just as your client had a right to file this case for defamation damages, Mr. Barnes had a right to file his claim in SDNY and did so.**

**MR. SUMMERS: Your Honor, I am not saying that he's legally prohibited from filing a claim. But what I am saying is the following. If you have a sophisticated set of business people talking about millions of dollars' worth of commerce, gosh, someone like Mr. Block, who's involved in a heavily, heavily regulated business, who himself is a lawyer, who was at Jones Day before he did this other activity, is not going to be just willy-nilly, breezily over a croissant,**

saying, oh, gosh, yeah, you can kind of have half the money, that's fine-

THE COURT: Well, you're getting into the-

MR. SUMMERS: I mean these are contracts, these are grown-ups at lease on my side of the table.

THE COURT: You're getting into the merits of the case. I'm not there. Okay. All right. I have two more questions, and then I'll be done, and I'll give you a few minutes to make any other argument and also to file something. So, the first question I have is, this case is still pending in front of Judge Swain, is that correct?

MS. FICKLER: Yes, Your Honor.

THE COURT: All right. And you can talk to your clients and then let me know about this in writing, but the first question I have is, do you have any objection to my discussing this with Judge Swain? And just as background on that, you know, I have met her. I don't know her well, but I have met her, and some years ago, pre-pandemic, I was taking cases from SDNY and went up there a few occasions and had arguments in their courthouse. And as a result of an appointment by the Chief Justice, you know that judges sometimes get appointed to sit in other jurisdictions. So that was a... And I did the same in the District of Delaware, because

they were having problems with not having enough judges for their cases as well. So, I did that with the SDNY for about a year. I never had a trial there, but I did go up for some arguments or hearings, whatever you want to call them. So that's question number one. I'm not saying I'm going to call her, but I would like your position, whether I should or should not. And if I did call her, one of the questions I might ask is whether, if I decided to keep this case here, how she would feel about some coordination with Discovery to avoid excessive expenses. The next question I have, and I ask this in every civil case, don't be offended, but I'd like to know if there are any settlement discussions going on. I ask that every time because, as you all know, 99% of civil cases get settled. And if you're on the verge of a settlement, but you haven't told me that yet, I would assume from the arguments in the briefing that you're not. But if you were, I would like to know about that when you submit your written request. Yes. You don't have to answer that right now. Now, I'd like to know, I said I'd give you some time, so I'd like to get whatever you want to file within a week. Is that enough time? By next Monday, October 6th. It's limited to 10 pages, double spaced. You're welcome to file anything you like in response to these questions, supplemental answers,

**citations, or so forth. And I will tell you that at this moment, I don't think it's necessary to take Discovery from... testimony to make a decision on the pending motion. But if you think it is, then I'd like you to include in your submission an offer of proof of what you would introduce with some details about what each witness would say and any documents you knew would want subpoenaed. But at the moment, I'm going to, which one of you filed the motion to quash?**

**MS. FICKLER: I did, Your Honor.**

**THE COURT: All right. All right. I'd like you to withdraw it if you don't mind. Otherwise, I'm going to deny it without prejudice, because I don't think it's necessary. We're going to, you know, if the case stays here, you're going to have a Discovery. I'll have a Rule 16 conference, and we'll talk about expert deadlines and Discovery deadlines and summary judgment and so forth. Is there a scheduling order like that in the SDNY?**

**MS. FICKLER: There is, Your Honor.**

**THE COURT: All right.**

**MS. FICKLER: And a trial... a... End of Discovery deadline of mid-April as I recall.**

**THE COURT: Okay.**

**MS. FICKLER: And we prepared... we are**

**prepare to present that order to the court today.**

**THE COURT: Well, if you have it here, you can hand it up if you have a copy. Or you can submit it with whatever.**

**MS. FICKLER: I already did.**

**THE COURT: All right. Okay. Now, I've been talking a lot, asking these questions. Either of you, I'll give each of you five minutes if you want to sum up or say anything that I haven't asked yet. All right. Ms. Fickler, it's your motion. No, no, strike.**

**MS. FICKLER: It is my motion.**

**THE COURT: Yeah, it's your motion to dismiss or transfer.**

**MS. FICKLER: And first of all, Your Honor, we will withdraw the motion to quash, in light of Your Honor's request.**

**THE COURT: Okay.**

**MS. FICKLER: We will do that either this afternoon or tomorrow morning. I think that... An attorney never wants to give up the opportunity to speak, but I can't-**

**THE COURT: You got a chance to submit something within seven days.**

**MS. FICKLER: That is exactly right. And, and it seems to me that perhaps I should wait to submit**

that document to put my thoughts together. We, I have I have argued here today in response to Your Honor's questions the fact that we believe that Mr. Block has admitted in his complaint in this action that the cases should be together and that the dispute between the parties is whether the cases should be litigated in Pennsylvania or New York. We believe that we fully satisfy the standards for transfer under 1404A as enumerated by the courts in terms of both the convenience, both the private interests that relate to the convenience of the parties and the witnesses and the public interests. And I've spoken about many of those here already today. I did include the question of where the claim arose. In, in... the, the, the judge in Texas clearly concluded that the alleged event giving rise to the suit included Barnes used his New York telephone number, spoke with a journalist in New York and in a newspaper article that was published in New York with a majority, majority of readers who are New York residents. From that perspective, I think he concluded that the claim arose in New York and so do we. As to the convenience of the witnesses, I've spoken to that. Yes, Mr. Barnes is here, but he is concerned about that duplication effect. And, and the requirement of double sets of lawyers here and in New York. He is concerned

about with third party witnesses who might have to be deposed in both cases. And it is that convenience of witnesses that drives this motion that seeks to have the two cases heard together. That's the thrust of what we are asking for. Indeed, Mr. Block argued early on that they should be heard together, but he never filed a motion. Not in Texas, not in New York. Even though he moved to dismiss the action in New York, he did not, as we did, ask for a motion to transfer. And we think, therefore, our motion, which we've been consistent on in terms of saying, we were the first to file, the first to file prevails, the cases should be heard together, they should be heard together in New York.

THE COURT: Thank you. Mr. Summers?

MR. SUMMERS: A handful of points. One, without doubt under 1404A, they've got the burden of forward and demonstrative basis for disturbing this forum. We provide an ample basis and reasons for why Mr. Block wants to proceed here. Those are good reasons for proceeding here. In contrast, Mr. Barnes is trying to not be in his hometown, as you can say, in some sense, he's got things standing on his head, but there's something weird going on with him running from his home forum. The only explanation we get is that he wants to have it all consolidated. Maybe that's because what he

really wants to do is try and smother the defamation claim, because that's where his defense, that's not a permissible and articulable, even articulable, reason. All along, we have said we would cooperate in any kind of two matters proceeding in an orderly way. In New York, I believe that Mr. Block took the position there was no personal jurisdiction, but also that New York was not a convenient forum, and the case should be transferred down here. So, he's okay, He's okay, and without having talked with him, if Your Honor, proposed to Chief Judge Swain, that Your Honor, would relieve the Southern District of New York and have both cases here-

THE COURT: That's not my... That's not my...I don't plan to ask her that question, to be honest.

MR. SUMMERS: I don't know if that would be a problem.

THE COURT: You can make a motion there to transfer.

MR. SUMMERS: There was a forum on convenience request. But in any event, Judge, in any event, look, there's going to be... there's, there's fully the opportunity to cooperate with the coordination of those cases. Mr. Block would do that. We would do that. I have complete confidence that that could be accomplished with Your Honor and Chief Judge Swink.

Sweet. Swain, pardon me. Chief Judge Swain.

THE COURT: She's no longer Chief Judge, but that's okay.

MR. SUMMERS: Okay.

THE COURT: She may be. I'm not sure.

MR. SUMMERS: All right. In any event, we're ready to move on this case if we want to proceed on this case.

THE COURT: Alright.

MR. SUMMERS: This case is... I mean, it took several years for there to be a ruling in the Southern District of New York. I think, Your Honor, is aware with respect to this.

THE COURT: Yes.

MR. SUMMERS: And Mr. Block has waited patiently with respect to this, and he has had no choice. But we respectfully request that we proceed because this is, this is, this is now where this is now where Mr. Barnes is. And this claim, I suspect the defamation arose by his activities here in communications. I don't know that. That would be irrelevant. That would be an interesting fact that we haven't heard representation of. With respect to his communications with the reporters, we know he's only occasionally in New York, and we're happy to be here if we want to be here.

**THE COURT: Thank you.**

**MR. SUMMERS: Thank you.**

**THE COURT: Now, so I'm not going to do anything until I get your submissions next Monday, which I will read promptly. So, I'm not going to do anything in this case until that, and I'm going to also order you and your clients not to do anything either, no serving subpoenas, no serving Discovery, okay? This case is stayed for at least one week until I issue an order on the pending motion. Fair enough?**

**MS. FICKLER: Yes, Your Honor.**

**MR. SUMMERS: Of course, Your Honor.**

**THE COURT: All right. Thank you for coming in. Thank you for your briefing. It's very well done on both sides.**

**MR. SUMMERS: Thank you very much.**

**THE COURT: Have a good day. Thank you.**

**(Court Adjourned)**

**CERTIFICATION**

**I, Rebeca Martinez, certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.**

R Mtz

**Signature of Transcriber**
**Rebecca Martinez**

**October 1,2025**
**Date**